594 A.2d 1237

OFFICE OF OCCUPATIONAL MEDICINE AND SAFETY OF The MAYOR AND CITY COUNCIL OF BALTIMORE

v.

BALTIMORE COMMUNITY RELATIONS COMMISSION OF The MAYOR AND CITY COUNCIL OF BALTIMORE, et al.

No. 1694, Sept. Term, 1990.

Court of Special Appeals of Maryland.

Sept. 9, 1991.

Kim I. Montroll, Asst. Sol. (Neal M. Janey, City Sol. and Deborah Young Skupien, Asst. Sol., on the brief), Baltimore, for appellant.

Patricia L. King (Noris C. Ramsey, on the brief), Baltimore, for appellees.

Argued before MOYLAN, BLOOM and DAVIS, JJ.

DAVIS, Judge.

Charles E. Johnson (Johnson), a former employee of the Baltimore City Fire Department, filed a complaint with the Baltimore Community Relations Commission (Commission) on May 15, 1985, alleging that the Office of Occupational Medicine and Safety of the Mayor and City Council of Baltimore (OOMS) discriminated against him on the basis of a physical disability. Following an investigation, the Commission issued a probable cause finding in support of Johnson's allegation. A hearing was held before the Honorable Milton B. Allen, the administrative hearing examiner, on April 8, 1987. Judge Allen held that OOMS failed to show beyond a mere possibility that Johnson's physical "condition" might create a future hazard to himself and others and ordered that he be reinstated and awarded back pay. The Commission concurred and affirmed the hearing exam-

iner's decision. Thereafter, the Commission issued an order reinstating Johnson and awarding him back pay. A complaint to enforce the Commission's order was filed, after which a hearing on the matter was held in the Circuit Court for Baltimore City. OOMS appeals from the court's order that the Commission's order be enforced. Because we find that there was substantial evidence from which a reasoning mind could have reached the conclusion reached by the Community Relations Commission, we affirm.

## BACKGROUND

Charles Johnson was hired by the Baltimore City Fire Department as a fire fighter cadet on April 22, 1985. He was conditionally hired, his continued employment being contingent upon his ability to pass the physical examination performed by OOMS. Included in the physical examination were chest and spinal x-rays. The results of those x-rays indicated that Johnson had a bullet lodged behind his sternum [1] and that he suffered from a bone spur on the C–6 vertebra complicated by degenerative arthritis in that area. Medical testimony established that 10 to 15 percent of the population in Johnson's age group have such spur development. Dr. Altieri, an internist and Chief of Occupational Medicine and Safety of the City of Baltimore, determined that Johnson was "not acceptable" as a fire fighter due to his spur and the increased "probability of future problems." Thus the Board of Fire Commissioners, based on the medical conclusions reached by OOMS, concluded that the latter condition disqualified Johnson from service as a fire fighter because he did "not successfully [meet] the physical requirements [2] for appointment to the Baltimore City Fire

---

**1.** OOMS abandoned the issue of the bullet because its medical experts determined that the bullet would pose no problems to the complainant's fitness.

**2.** Aside from testimony that fire fighters must be able to climb ladders with heavy equipment, lift, push, and stoop, the record at hand is devoid of specific, well-defined qualifications for a fire fighter. At the

Department." Consequently, the complainant was terminated and compensated for time served as a cadet.

At the hearing on the matter before the hearing examiner, on April 8, 1987, Dr. Robert Draper, an orthopedic surgeon who had reviewed Johnson's x-rays, reported that Johnson had a 50 percent probability of either future injuries or deterioration of his present condition were he to perform the duties of a fire fighter. Dr. Elroy Young, also an orthopedic surgeon, who had examined Johnson and reviewed his x-rays, testified that he found no cervical spine abnormalities and concluded that Johnson is unrestricted in his ability to lift, push, climb, and stoop. Dr. Altieri examined Johnson's medical records and testified that he was not acceptable as a fire fighter because, in his opinion, the risk of future injury due to the bone spur and attendant arthritis would be very great. Dr. Altieri specifically testified that he was not concerned with Johnson's ability to perform the job with regard to his medical "condition" but with the probability of further aggravation of the condition over the years and the prolonged periods of recovery after an injury.

conclusion of the hearing, counsel for OOMS requested that both parties stipulate as to the job qualifications. The court, unfortunately, never made a ruling as to this request. OOMS, nonetheless, attempts to justify Johnson's discharge on a failure to meet qualifications which were never established by OOMS or accepted by the court as stipulated by the parties. As an example of specific job qualifications for fire fighters, we list Regulation No. 7 of the Fire Protection District, cited in *Colorado Civil Rights Commission v. North Washington Fire Protection District*, 772 P.2d 70, 73 (1989):

Certain specific deficiencies will disqualify [an applicant] unless waived by medical examiner and approved by the commission. Deficiencies that disqualify are generally the following:

. . . .

18. Limbs—arms, legs, hands and feet must be free from afflictions of the joints, stiffness, or other conditions such as flat feet, ingrown nails, or hammer toes.

. . . .

23. Rheumatism—any history of acute rheumatic fever, stiffening of the joints or other impairment.

. . . .

27. Any other impairment which might prevent the applicant from doing his assignment efficiently.

Although the job specifications of a fire fighter were never specifically delineated by OOMS, Johnson testified at the hearing that he was familiar with the duties of a fire fighter and that he believed he could perform those duties. He also testified that he had performed strenuous physical activity regularly in his previous employment and also does so without restriction in his present job. The basis of Johnson's termination was Dr. Altieri's prognostication of increased "probability of future [physical] problems" and the corresponding financial liability the city could incur in the future. OOMS, however, in its brief and at oral argument, bottoms its decision on Johnson's ability to satisfy the qualifications of a fire fighter.

## LAW

### I.

### Standard of Review

■ The standard of review we employ gives great deference to the findings of the hearing examiner and the Commission, who are experienced in the matters that come before them. Thus, "[w]e may not ... substitute our judgment for the expertise of the agency." *Maryland Comm'n On Human Relations v. Mayor and City Council of Baltimore,* 86 Md.App. 167, 173, 586 A.2d 37 (1991). The test of appellate review stated by the Court of Appeals is "whether ... a reasoning mind could reasonably have reached the conclusion reached by the [agency], consistent with a proper application of the [controlling legal principles]." *Ramsay, Scarlett & Co. v. Comptroller,* 302 Md. 825, 838, 490 A.2d 1296 (1985). Thus, this Court will only reverse the trial court's holding if there was no substantial evidence before the Commission on which to support its conclusions and, therefore, arbitrarily decided the issues presented. As we shall explain, there was more than substantial evidence presented to the Commission on which to base its conclusions. Thus, we are bound to defer to the decision of the Commission and must affirm the circuit

court which independently determined that the Commission had not acted arbitrarily. It is not within our mandate to substitute our judgment for the expertise of the agency, and we decline to do so.

## II.

### Jurisdiction

█ OOMS's first contention is that Johnson does not suffer from a "physical disability" within the meaning of the Baltimore City Code, Article 4, § 9(14) (1988), but merely has a "physical limitation" which makes him "unsuited" for the job. Accordingly, OOMS argues that Johnson could not have been discriminated against on the basis of a handicap, as he was not "handicapped" and thus does not come within the ambit of Baltimore City Code, Article 4, § 9(6).

In support of its contention that Johnson is unfit for the position of a fire fighter, OOMS relies on § 9(6), which provides in pertinent part:

> *Discrimination* means any difference in the treatment of an individual or person because of race, color, religion, national origin, ancestry, sex, physical or mental disability ... except that it shall not be discrimination ... for an employer to disqualify a person with a physical or mental disability when the nature or extent of the disability makes the person unfit or unsuited for the job....

Judge Alpert of this Court reasoned in a factually similar case that if an employee's rejection was based on his actual or perceived "handicap" and he *failed to satisfy* the requirements for the job, his dismissal was not discriminatory. *Mass Transit v. Comm'n on Human Relations*, 68 Md.App. 703, 708–09, 515 A.2d 781 (1986), *cert. denied*, 308 Md. 382, 519 A.2d 1283 (1987). The logical extension of the reasoning in *Mass Transit*, as it applies to the case *sub judice*, is that Johnson's rejection was based on a perceived "handicap" and was unlawful and discriminatory because he *satisfied* the requirements for the job. We hold that the

complainant had no handicap or disability but was erroneously determined to be lacking the necessary qualifications for the job because of a *perceived future handicap.* Thus, we consider the propriety of Johnson's cause of action under the pertinent discrimination laws. *Id.* 68 Md.App. at 715, 515 A.2d 781.

In *Mass Transit,* a bus driver was denied employment on the basis of his elevated blood pressure. The complainant in that case alleged that "he was discriminated against because the MTA perceived him as an individual suffering from the handicap of hypertension." *Id.* at 711, 515 A.2d 781. The only reason that the result in *Mass Transit,* affirming the denial of employment due to the applicant's inability to satisfy the job requirements, is at odds with the result in the instant case is because Johnson was able to meet the *bona fide* job qualifications. *Id.* at 715, 515 A.2d 781.

In a case in which an applicant for an entry-level fire fighter position was refused employment because of poor eyesight, which was correctable to 20/20, the Supreme Court of Colorado, in setting forth the burden of proof where discrimination based on a perceived handicap is claimed, held that

[t]o make out a *prima facie* case of employment discrimination under section 24–34–402(1)(a), an applicant bears the burden of showing that he or she is handicapped within the meaning of section 24–34–301(4), that the applicant was otherwise qualified to perform the job, and that an employer refused to hire the applicant "because of handicap." Once these three conditions are met, the burden shifts to the employer to show that there is no reasonable accommodation that the employer can make with regard to the handicap, that the handicap actually disqualifies the applicant from the job, and that the handicap has a significant impact on the job.

*Colorado Civil Rights Commission v. North Washington Fire Protection District,* 772 P.2d 70, 75–76 (1989) (citations omitted).

In discussing "perceived handicap," *Colorado Civil Rights Commission* observes that

[a] person "is regarded as having an impairment" under Rule 60.1(B)(1)(d) in three circumstances: first, although the person has a physical impairment, the impairment does not substantially limit one or more of the person's major life activities yet the employer treats the person as being substantially limited in one or more major life activities; second, the person has a physical impairment which substantially limits one or more of a person's major life activities but does so only as a result of the employer's attitudes; and third, the person has no physical impairment but is treated by the employer as having an impairment.

The court further reasoned as follows:

Rule 60.1(B)(1)(d)(1) clearly contemplates that an applicant could be "regarded as having an impairment" when he or she has a physical impairment but the impairment does not substantially limit one or more major life activities, *so long as the employer treats the applicant's impairments as substantially limiting one or more of the person's major life activities.*

. . . .

Accepting this reasoning, we agree with the applicants that the court of appeals erred in concluding that the District did not regard Gargano to be handicapped. We hold as a matter of law that Gargano is handicapped within the meaning of section 24–34–301(4) because the District treated him as being substantially limited in one or more major life activities even though he possessed no such substantial limitation.

Rule 60.1(B)(1)(d)(3) provides that an applicant "is regarded as having an impairment" even if the person has no impairment, so long as the employer treats the applicant as having an impairment. This category protects individuals who may be completely recovered from a previous impairment or who may be erroneously classified as having an impairment.

*Id.* at 79 (citation omitted). Thus in reversing the Colorado Court of Appeals,[3] the Supreme Court interpreted a statute similar to Article 4, § 9(6) and expressly held that jurisdiction attaches where the employer regards the applicant as handicapped.[4]

The Maryland statute governing discriminatory practices in the work place, art. 49B, § 16(g) (1979), employs a very similar broad definition of the word "handicap" as the Baltimore City Code employs for "physical disability." The interpretive handicapped discrimination guidelines reflect this broad definition in the same way as the Commission's guidelines by including within it individuals who are *regarded as having a handicap* [5] or who have a past history or record of having a handicap, as well as those who are actually handicapped. COMAR 14.03.02.03(B) and (C) (1979) (emphasis added). The Code of Maryland Regulations, in language which OOMS argues is clearly intended to be applicable under the city legislation, delimits the concept of a handicap to "a substantial limitation on one or more of a person's major life activities." COMAR 14.03.02.-03(A)(1979). "Major life activities may be considered to include, but are not limited to, employment, transportation, adapting to housing, communication, self care, recreation, socialization, education, and vocational training." *Id.*

---

**3.** Summary judgment in favor of the complainant had been granted; however, there existed a genuine dispute as to whether the denial had been based, in part, on the results of a written test. *Id.* at 80.

**4.** *Cf. Chico Dairy Co. v. Human Rights Commission,* 382 S.E.2d 75, 82 (1989), where a "legislative rule" recognizing a cause of action for perceived handicap was invalid because it was not submitted for review and approval to the legislature as required by the West Virginia Code.

**5.** "[I]ndividuals who are *perceived* as having a handicap, whether an impairment exists or not, but who are regarded as handicapped by persons who have or may have an effect on the individual's securing housing or public accommodations, or securing, retaining, or advancing in employment, or all of these." COMAR 14.03.02.03(C) (1979) (emphasis added).

Thus it is clear that an individual is "physically disqualified" or "handicapped" for purposes of invoking the state or city legislation prohibiting discrimination against such persons if his employer *perceives* him to be "physically disqualified" or "handicapped," *i.e.* substantially limited in performance of major life activities, whether or not the individual is so limited. *See Mass Transit v. Comm'n on Human Relations, supra; B & O Railroad v. Bowen,* 60 Md.App. 299, 482 A.2d 921 (1984).

Here it is clear that the sole basis upon which Johnson was denied employment was that OOMS perceived him to have a potential future handicap. Although OOMS never alleged that Johnson was suffering from a handicap and specifically avoided the term "handicap" at all times, the principal reason for the recommendation of dismissal was OOMS's belief that it was likely that Johnson, if he suffered an injury, would experience "future injury or discomfort and pain, longer periods of recovery," and "aggravation of the existing physical condition." Since no allegations were made that Johnson is impaired in one or more of his major life activities and indeed Johnson's testimony indicates that he was able to satisfy any of the specified job qualifications, if OOMS's reason for not recommending his employment was justified (see infra at III), then it is clear that this "potential future handicap" would impair major life activities, *e.g.,* earning a living.

### III.

#### Johnson's Ability to Perform Duties

In addressing who bears the burden of persuasion that a complainant can perform the duties of the employment sought, we said in *B & O Railroad v. Bowen,* 60 Md.App. 299, 309, 482 A.2d 921 (1984), that the burden of establishing a *prima facie* case of handicap discrimination rests on the complainant and he must show not only that he was physically able to perform the duties of the job sought but also that his rejection was solely on the basis of his

handicap or perceived handicap. Only then does the burden of persuasion shift to the employer to show to a reasonable probability that the complainant's physical handicap would create a future hazard to the health and safety of either the applicant or the public at large. *Id.* at 309, 482 A.2d 921.

The record indicates that Johnson has been able to perform similarly taxing jobs in which he lifted, with a hoist, drums weighing up to 700 pounds. Before applying for the fire fighter position, he was employed with a company in the area of general maintenance as an oiler. His basic duty was to lubricate heavy-duty machinery. Johnson testified that he was required to climb as high as 80 feet above the ground carrying equipment weighing 30 pounds in addition to tools. He stated that, since he was terminated by the Baltimore City Fire Department, he has worked as an emergency medical technician for a private ambulance company. There, in order to transport patients to doctors' offices, he is often required to lift patients into and out of ambulances. Moreover, there was evidence that the complainant has always participated in sports, has played football and baseball, and was involved in wrestling. He testified that he jogs and often exercises strenuously without experiencing any physical problems.

It is apparent from this evidence that Johnson was able to perform the duties of a fire fighter. He also was not limited in one or more of his major life activities and thus was physically able to perform the duties of the job at the time of his dismissal. Thus, the Commission did not act arbitrarily and capriciously in reaching these same conclusions. *Human Relations Comm'n v. Baltimore*, 86 Md. App. 167, 172, 586 A.2d 37 (1991).

Secondly, Johnson establishes that because of his ability to perform regular life activities—running, climbing and stooping—he was not handicapped. Thus, as we have explained herein, it is evident from the facts presented that the Commission could have reasonably reached the conclusion that Johnson's rejection was solely based on his per-

ceived handicap and that Johnson has met his burden to establish a *prima facie* case of handicap discrimination.

Paradoxically, it is appellant who interjects the issue of handicap in the proceedings by basing its discharge on Johnson's possible future physical condition, thereby rendering the conferring of jurisdiction a justiciable issue in this case. In light of extensive testimony of complainant's present physical suitability to perform the job, counsel, in oral argument, was hard-pressed to suggest a physical basis for the complainant's discharge that was not the equivalent of a physical handicap or perceived physical handicap.

## IV.

### Evidence By OOMS That Johnson Could Not Perform Duties

Since the complainant put forth evidence that he could perform the job, the burden of persuasion shifted to the fire department to show that his condition could likely pose a hazard to the public. *B & O Railroad,* 60 Md.App. at 309, 482 A.2d 921. "Where an employer contends, for example, that a certain characteristic in a particular job is a *bona fide* occupational qualification, the burden has been placed on the employer to show that such a characteristic is reasonably necessary to the performance of the job." *Id.* at 311, 482 A.2d 921. A physical handicap which would "reasonably preclude the performance of the employment" serves as a valid defense to a discrimination allegation.[6] *Mass Transit,* 68 Md.App. at 713, 515 A.2d 781.

In the instant case, the hearing examiner heard testimony of the physical requirements that fire fighters ostensibly would have to meet, such as climbing ladders and carrying heavy equipment and 80 pound air packs. Although not well defined, these criteria were accepted as *bona fide*

---

**6.** Appellant has never asserted that Johnson is *presently* unable to perform the duties of a fire fighter.

occupational standards. Since there was evidence that Johnson could physically meet these requirements, he "demonstrated that he could perform the job without posing a threat to public health because he did not suffer from a disability or handicap." *Id.* at 712, 515 A.2d 781.

## V.

### Evidence of Future Hazard

OOMS dismissed Johnson because of a perceived future handicap, *i.e.*, the possibility existed that a disability could manifest itself in the future. OOMS, before the hearing examiner and now on appeal, argues that "[i]t is unreasonable to expect the City to hire an individual only to look forward to absorbing thousands of dollars in medical bills, sick leave, time off or disability retirement benefits." For this reason, OOMS claims that even if Johnson established that he was not hired because of his perceived physical disability, as we have held is the case because Johnson's condition "created a probability of future injury," it was justified in its action. It is well settled, however, that, once an employee establishes a *prima facie* case of handicap discrimination, as Johnson has done here, the employer has the burden to establish to a "reasonable probability" that the complainant's physical handicap or perceived physical handicap would create a future hazard to his health or safety. *B & O Railroad*, 60 Md.App. at 309, 482 A.2d 921. In that case, appellant also contended that the dismissal of its employee, Robert L. Bowen, was justified because of the potential for further injury which the condition created. *Id.* at 307, 482 A.2d 921. Mr. Bowen was awarded permanent partial disability by the United States Army because of a bullet lodged in his third lumbar vertebra. The medical expert "could not state what the probability was that the bullet might become dislodged" but "testified only that there was a possibility that the bullet would become dislodged with strenuous work." *Id.* at 308, 482 A.2d 921. Thus, the hearing examiner properly "found that B & O

could not demonstrate a future hazard with 'reasonable probability'...." *Id.*

Similarly, in the case *sub judice,* the Commission could reasonably conclude that medical expert testimony only established the mere possibility of potential future harm from the C–6 spur to the complainant. Dr. Draper, the outside orthopedic surgeon, reported that "it is conceivable that the patient has an increased propensity for problems with neck pain if he were to sustain an on-the-job injury to the neck." He added at the hearing of the Baltimore Community Relations Commission that Johnson could experience a prolonged recovery period after an injury, and that the presence of the spur would increase the probabilities of future injury or discomfort in the neck following the subsequent injury. Dr. Raymond Altieri, Chief of OOMS, testified that he "felt that the probability of future problems with the cervical spur was very great," and that, when and if injured, recovery would take longer than normal.

Even though the term "probability" was used by both doctors to describe the likelihood of future problems in the event Johnson was injured in the neck area (an injury which may never occur and thus is in itself a mere possibility), the Commission could reasonably have reached the conclusion that the evidence presented did not establish to a reasonable probability the future hazard to Johnson's health and safety. *Ramsay,* 302 Md. at 838, 490 A.2d 1296. First, we note that Dr. Altieri testified that on May 8, 1986, he assigned a 50 percent probability of either future injuries or deterioration of Johnson's present condition to his medical evaluation of the complainant, when he dictated an addendum to his prior report on Johnson. This information was, however, not requested of Dr. Robert Draper by Dr. Altieri until one year after Johnson was terminated and had filed a complaint. Therefore, the hearing examiner and the circuit court could properly find that, at the time of Johnson's dismissal, only a possibility, not a probability, of future injury was established and Johnson's dismissal was unlawful. Moreover, another expert, Dr. Elroy Young, an ortho-

pedic surgeon, testified that, despite the spinal spur, Johnson had a normal spine examination and experienced no restriction on his physical capacity. Since the evidence is in dispute as to whether Johnson would experience a disabling aggravation of his condition, the agency could properly conclude on this basis that OOMS failed to prove that Johnson would be precluded from performing his job. In sum, the Commission had before it substantial evidence to support its findings and those findings were thus not arbitrary or capricious.

JUDGMENT AFFIRMED.

COSTS TO BE PAID BY APPELLANT.