538 S.E.2d 389

**Ira Timothy STONE, Plaintiff below, Appellee,**

v.

**ST. JOSEPH'S HOSPITAL OF PARKERSBURG, a West Virginia Corporation, Cass Palmer and Jackie M. Scott, Defendants below, Appellants.**

No. 26962.

Supreme Court of Appeals of West Virginia.

Submitted May 3, 2000.

Decided July 14, 2000.

Concurring and Dissenting Opinion of Justice McGraw Oct. 20, 2000.

---

Walt Auvil, Esq., Pyles and Auvil, Parkersburg, West Virginia, Attorney for Appellee.

Ricklin Brown, Esq., Bowles, Rice, McDavid, Graff & Love, Charleston, West Virginia, for Amicus Curiae West Virginia Chamber of Commerce.

Bryan R. Cokeley, Esq., Sandra K. Wilson, Esq., Steptoe & Johnson, Charleston, West Virginia, Attorneys for Appellants.

Steven L. Thomas, Esq., Kay, Casto, Chaney, Love & Wise, Charleston, West Virginia, Attorney for Amicus Curiae West Virginia Hospital Association.

STARCHER, Justice:

This is an appeal from a circuit court's order entering judgment on a jury's finding that a hospital had committed disability discrimination against an ambulance paramedic employee of the hospital. We conclude that the jury was not properly instructed, and also that the plaintiff did not present a sufficient evidentiary case to prove disability discrimination. We reverse the circuit court's judgment order.

## I.

### Facts & Background [1]

The plaintiff below and the appellee before this Court is Mr. Ira Stone ("Mr. Stone"). In July of 1997, Mr. Stone had been an employee of St. Joseph's Hospital ("the Hospital"), the defendant below and appellant,[2] in Parkersburg, West Virginia, for approximately 22 years. During his employment with the Hospital, Mr. Stone's principal work was as an EMT and then as a paramedic, on an ambulance crew. This is a highly skilled

---

1. A number of the details of the conduct of Mr. Stone and the Hospital were disputed in the trial. However, certain facts were uncontradicted and well-established by the evidence. For the purposes of this appeal, we are required to resolve any factual or inferential conflicts in the evidence in favor of Mr. Stone.

2. Two additional defendants/appellants are individual Hospital employees who were involved in the employment actions that Mr. Stone challenges in the instant case. In this opinion we include these persons in the term "Hospital."

and physically demanding occupation. It involves driving an emergency vehicle, providing skilled emergency medical care, and engaging in regular, sometimes strenuous physical exertion—often under challenging physical and psychological circumstances. By all accounts, Mr. Stone did his work in an admirable fashion, always meeting and often exceeding expectations in his evaluations.

On two occasions in July of 1997, Mr. Stone reported to the Hospital—on Workers' Compensation forms that the Hospital required to be filled out in instances of any sort of workplace injury—having had a minor strain to his back when he exerted himself in an on-the-job lifting maneuver. In both instances, a Hospital emergency room physician examined Mr. Stone, an x-ray was done, the physician found no problems, and Mr. Stone was released to work. On one occasion, a nurse noted the name of a narcotic-type pain relief medicine on one of the forms.[3]

In late July of 1997, after reviewing these report forms, several Hospital staff met and decided to take Mr. Stone off his regular ambulance paramedic job for an indefinite period pending the results of an independent medical examination; to reassign Mr. Stone to an office "dispatcher" position; and to schedule Mr. Stone for an independent medical examination by a back specialist.[4]

Several reasons for this decision were advanced at trial by the Hospital: (1) concern, based on the reports on the July forms (and on an alleged similar verbal report, see note 3 supra) that Mr. Stone could have a back problem that could worsen or become more severe if he had further back strain; (2) concern that such a back problem, and/or his use of a narcotic-type pain medication while

working as an ambulance paramedic, could endanger Mr. Stone, his patients, his co-workers, or the public; and (3) concern that Mr. Stone, by formally reporting incidents of minor back strain in a somewhat unprecedented fashion, could be somehow "setting up" the Hospital for a workplace injury lawsuit.

Before Mr. Stone was formally informed of the decision to change him from his regular ambulance duties, he heard about the decision from a friend who also worked at the Hospital. Mr. Stone arranged to be examined on August 4, 1997, by Dr. Powderly, who is the chief of the medical staff at the Hospital. See note 3, supra. Dr. Powderly gave Mr. Stone a note saying that Mr. Stone was able to work at his ambulance job without restrictions. Dr. Powderly also made arrangements for Mr. Stone to be examined by a neurologist, Dr. Loar, on August 11. This specialist also found no limitations on Mr. Stone's ability to do his regular ambulance job.

On August 5 and August 11, 1997, Mr. Stone met with Hospital staff about the decision to transfer him to a dispatcher position. (He began work as a dispatcher on August 5.) At the meetings, Mr. Stone strongly objected to the transfer, stating that it was unnecessary, unfair, and unreasonable. He said that he had no work limitations or impairments. He provided a copy of Dr. Powderly's note, and Mr. Stone testified that he also told the Hospital of Dr. Loar's conclusion. Mr. Stone denied using the narcotic pain medicine, and gave an explanation of why its name appeared on an injury report form.[5] See note 3, supra.

The Hospital would not retreat from the transfer decision and the Hospital proceeded

---

3. On several occasions during May and June of 1997, Mr. Stone had also seen Dr. Powderly, who is the chief of the medical staff at the Hospital, for occasional "positional" pain in Mr. Stone's legs. Dr. Powderly prescribed the pain relief medicine. Mr. Stone had not reported these consultations with Dr. Powderly to the Hospital, nor was he required to do so by any Hospital policy. At trial Mr. Stone testified that he had briefly taken the pain relief medicine, but it had not "agreed" with him. One Hospital employee testified at trial that Mr. Stone had also verbally reported a third back strain during July.

Mr. Stone denied making any such verbal report. Hospital rules required that this alleged report be noted in writing by the employee who received it, but it was not so noted.

4. Mr. Stone had on occasion done dispatcher duty in the past, but his primary work was as an ambulance paramedic.

5. The Hospital acknowledged at trial that it knew it had the right to require Mr. Stone to take a drug test, but it did not do so.

to arrange for Mr. Stone to be examined by a specialist. This examination, apparently due to scheduling problems, did not take place until October 28, 1997. Meanwhile, while working as a dispatcher, Mr. Stone received the same rate of pay that he had received as an ambulance paramedic—a higher rate than the usual dispatcher pay rate—but he worked fewer hours per week. The Hospital contended that Mr. Stone chose to work fewer hours per week as a dispatcher than he had been working as an ambulance paramedic; Mr. Stone said he had no choice in the matter. Mr. Stone presented evidence showing that he had received a total of about $2,000.00 less in pay over the 4-month period that he was removed from ambulance duty.

After a full examination, Mr. Stone was medically cleared to return to his regular job by the back specialist, and on November 25, 1997, Mr. Stone returned to his ambulance paramedic position.

Shortly before he returned to his ambulance position on November 14, 1997, Mr. Stone filed the instant action against the Hospital, asserting, *inter alia*, disability discrimination under the West Virginia Human Rights Act, *W.Va.Code*, 5–11–1, *et seq.*[6] The gist of Mr. Stone's disability discrimination complaint was that he was unreasonably and unnecessarily removed from his regular job—even though he had been fully cleared to work at that job by two doctors at the Hospital's own emergency room, and even though he had presented additional evidence of medical clearance from the chief of the Hospital's medical staff and a specialist. Mr. Stone noted that the Hospital never even contacted any of these physicians. Moreover, while the Hospital claimed to be motivated by a concern about Mr. Stone's use of a prescribed pain relief drug, Mr. Stone assert-ed the Hospital wrongfully ignored Mr. Stone's denial of taking the drug, and did not request that he take a drug test that would have shown whether he in fact presented any risk.

Mr. Stone also contended at trial that he believed that the decision by the Hospital to remove him from his ambulance job—a job in which he took great pride—had been influenced by another, undisclosed factor: Mr Stone's former wife's anger at him. The former Mrs. Stone was a management employee of the Hospital and a recent officemate of one of the people involved in the decision to remove Mr. Stone from his ambulance position. Mr. Stone had successfully litigated an alimony claim against the former Mrs. Stone, and in June of 1997 he had attached her wages at the Hospital to collect the alimony. Mr. Stone testified that his former wife had threatened him with retribution in June of 1997; she denied making any such threats.

At trial, the Hospital contended that what the Hospital did regarding Mr. Stone was entirely reasonable and generous under the circumstances—and was done entirely out of proper precautionary and safety-related motives. The Hospital argued that it was applying its "light duty" employment policy in requiring Mr. Stone to leave his normal work assignment, and in requiring him to not engage in exertional work until and unless he was cleared by an independent examining physician.[7]

The Hospital also argued that it did no harm to Mr. Stone in the job reassignment, because he was paid at his regular rate and because he was reinstated to his ambulance paramedic position without any detriment.

---

6. A claim for invasion of privacy related to Mr. Stone's medical records was dismissed by the circuit court and is not involved in this appeal.

7. The Hospital's personnel policies allowed employees to accrue extended illness bank (EIB) days off, that could be used (with a statement from the employee's doctor and with hospital approval) in case an employee was unable to work due to illness, etc. In connection with the EIB program, the Hospital stated in its personnel policy handbook that it, "reserve[d] the right to arrange a light duty assignment following the employee's physician criteria and with physician approval. Refusal to accept the light duty assignment disqualifies the employee from utilizing EIB benefits." Hospital personnel admitted at trial that the "light duty" policy had never—before Mr. Stone's case—been applied to require an employee to involuntarily shift from their normal position when the employee's physician had said the employee was fully capable of performing their regular duties.

At trial, the jury found for Mr. Stone, and awarded him damages of $2,125.44. The circuit court entered judgment on this verdict. It is from this judgment order that the Hospital appeals.

### III.

### *Standard of Review*

■ The Hospital makes two basic arguments on appeal. First, the Hospital argues that the circuit judge failed to properly instruct the jury as to the law applicable to the case. We review instructions by looking at the charge as a whole, giving due regard to the judge's discretion in formulating the court's statements of the law, and in this case looking particularly to whether the court refused to instruct the jury with correct law as submitted by the Hospital that was not covered otherwise in the charge. As we stated in Syllabus Point 4 of *State v. Guthrie,* 461 S.E.2d 163, 194 W.Va. 657 (1995):

> A trial court's instructions to the jury must be a correct statement of the law and supported by the evidence. Jury instructions are reviewed by determining whether the charge, reviewed as a whole, sufficiently instructed the jury so they understood the issues involved and were not mislead by the law. A jury instruction cannot be dissected on appeal; instead, the entire instruction is looked at when determining its accuracy. A trial court, therefore, has broad discretion in formulating its charge to the jury, so long as the charge accurately reflects the law. Deference is given to a trial court's discretion concerning the specific wording of the instruction, and the precise extent and character of any specific instruction will be reviewed only for an abuse of discretion.

Second, the Hospital argues that even under correct instructions, Mr. Stone's disability discrimination case should never have gone to the jury, because he failed to make out a sufficient evidentiary case—even resolving all evidentiary and inferential issues in his favor—that would entitle him to relief. The Hospital presented this argument to the circuit court in various motions that were made before, during, and after trial—and in

each case, the circuit court denied the Hospital's motion.

■ On appeal, the Hospital presents their evidentiary insufficiency argument by first contending that Mr. Stone did not present sufficient evidence to show that he was a "person with a disability within the meaning of the law" who had protected status to invoke the protections of the law against disability discrimination. Second, the Hospital contends that as a matter of law, what the Hospital did in placing Mr. Stone in a dispatcher position did not constitute disability discrimination. Like the trial court, in addressing these issues we resolve all factual and inferential issues in Mr. Stone's favor and we review the circuit court's rulings *de novo* insofar as they involve purely legal questions. We stated our standard in Syllabus Point 3 of *Alkire v. First Nat. Bank of Parsons,* 197 W.Va. 122, 475 S.E.2d 122 (1996):

> The granting of a motion for judgment notwithstanding the verdict is reviewed *de novo,* which triggers the same stringent decisional standards that are used by the circuit courts. While a review of this motion is plenary, it is also circumscribed because we must review the evidence in a light most favorable to the nonmoving party.

### IV.

### *Discussion*

### A.

### *The Hospital's Claim of Instructional Error*

■ The Hospital's first argument is that the circuit judge erroneously refused to instruct the jury correctly as to matters of law that were contained in instructions proposed by the Hospital.

In addressing this issue, we begin by quoting the portion of the circuit court's charge to the jury that instructed them as to the applicable law of disability discrimination:

> Now, the law, in the form of the West Virginia Human Rights Act, makes it unlawful for any employer to discriminate against an individual with respect to terms,

conditions, or privileges of employment if the individual is able and competent to perform the services required.

\* \* \* \* \* \*

Under the law of this State, a disabled person is one who, one, has a mental or physical impairment which substantially limits one or more of such person's major life activities. The term "major life activities" includes functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working; two, has a record of such impairment; or three, is regarded or perceived as having such an impairment.

"Regarded or perceived as having an impairment" means that the Plaintiff Ira Stone either: one, has a physical or mental impairment that does not substantially limit major life activities, but is treated by the Defendants has having such a limitation; two, has a physical or mental impairment that substantially limits major life activities only as the result of the attitudes of the Defendants towards such impairment; or three, has none of the impairments defined above, but is treated by the defendants as if he had such an impairment.

The employment discrimination claim of Ira Stone against St. Joseph Hospital, Cass Palmer, and Jackie Scott is directed only toward alleged discrimination on the basis of a perceived disability. Therefore, even if you may disagree with the actions of the Defendants or feel such actions were unfair, that alone is not a sufficient legal basis to find in favor of Stone and against the Hospital and Palmer and Scott.

\* \* \* \* \* \*

Accordingly, even if you believe, by a preponderance of the evidence, that the Plaintiff Ira Timothy Stone is entitled to recover in this case, on this disability discrimination claim, you may not award him such damages unless you believe, from a preponderance of the evidence, that he has suffered such damages as a direct and proximate result of disability discrimination, as I have explained it to you.

■ This was by any measure a "bare-bones" charge on the core legal issues of the case—although that fact alone does not make the charge erroneous. In fact, we have stated that in discrimination cases like the instant one, "jury instructions should be written to convey clearly for the lay person the operation of discrimination and should avoid obscuring the forest of discrimination with the trees[.]" *Barlow v. Hester Industries, Inc.,* 198 W.Va. 118, 135, 479 S.E.2d 628, 645 (1996).

The Hospital submitted and the circuit court refused to give proposed instructions that, *inter alia,* contained the following language:

[1] [A]n employer may require an employee to submit to a medical examination and make inquiries of an employee as to whether such employee has a disability if such examination or inquiry is job related and consistent with business necessity.

[2] [T]he mere fact that an employer placed an employee on light duty . . . does not establish a "regarded as" [disability] claim.

The first of these proposed instructions is directly supported by *West Virginia Code of State Regulations,* 77–1–5.5 [1994], issued pursuant to the anti-disability-discrimination provisions of our Human Rights Act, *W.Va. Code,* 5–11–9 [1998].[8] 77–1–5.5 states in pertinent part:

After commencement of employee's employment duties, an employer shall not require a medical examination and shall not

---

8. *West Virginia Code of State Regulations* 77–1–1 to 77–1–7 is a detailed explication of the general anti-discrimination requirements of the Human Rights Act, *W.Va.Code,* 5–11–9 [1998], which states in part:

It shall be an unlawful discriminatory practice, unless based upon a bona fide occupational qualification, or except where based upon applicable security regulations established by the United States or the state of West Virginia or its agencies or political subdivisions:

(1) For any employer to discriminate against an individual with respect to compensation, hire, tenure, terms, conditions or privileges of employment if the individual is able and competent to perform the services required even if such individual is blind or disabled[.]

(We shall in this opinion refer to the most recent enactment of the provisions of the Human Rights Act except where the language of an earlier enactment is of consequence.)

make inquiries of an employee as to whether such employee has a disability or as to the nature and severity of the disability, unless:

5.5.1. Such examination or inquiry is shown to be job related and consistent with business necessity....[9]

■ Thus, based on the clear language from the regulations that implement the Act, the West Virginia Human Rights Act, *W.Va. Code*, 5–11–9 [1998], requires that after commencement of an employee's employment duties, an employer shall not require an employee to submit to any medical examination, excepting tests for illegal drugs and voluntary examinations including histories which are part of an employee health program available to employees at that work site; and an employer shall not make inquiries of an employee as to whether such employee has a disability or as to the nature and severity of the disability—unless such examination or inquiry is job-related and consistent with business necessity.

This Court has recognized the right of an employer to protect employees, the public, and the workplace from danger or injury that might occur as a result of a person's possible impairments, when such protection is done in a fashion that is consistent with the duty of reasonable accommodation. We stated in Syllabus Points 2 and 3 of *Davidson v. Shoney's Big Boy Restaurant*, 181 W.Va. 65, 380 S.E.2d 232 (1989):

9. The regulation goes on to exclude tests for illegal drugs and voluntary examinations pursuant to employee health plans that are available to all employees.

10. In connection with the "light duty" issue, we have in the instant case a brief filed by the *amicus curiae* West Virginia Hospital Association and West Virginia Chamber of Commerce. The brief states, in part:

An invaluable method of getting injured employees back to work in a timely fashion has been the advent of transitional or "return to work" programs. Employers throughout the country are encouraged by risk management publications, human resource publications, business publications, and the like to make return-to-work programs a part of their corporate culture. Return-to-work programs can consist of (1) alternative or light duty programs; (2) modified duty programs; or (3) work hardening programs. Because of the application of these type of programs, more employees are returning to work after a dis-

2. In deciding whether an employee poses a risk to her personal safety [so as to permit an adverse employment action regarding a person with a disability based on such a risk], the employer must show a reasonable probability of a materially enhanced risk of substantial harm to the employee based on a consideration of the job requirements in light of the employee's handicap, and the employee's work and medical history.

3. As a general rule, to satisfy the standard of a serious threat to one's health or safety, the employer must establish that it relied upon competent medical advice that there exists a reasonably probable risk of serious harm.

■ Based on the right and duty of an employer to establish and maintain both a safe *and* non-discriminatory workplace, it seems clear to us that an employer may require an employee to work under temporary precautionary employment conditions and limitations, such as a "light duty" assignment, pending the results of an otherwise permissible inquiry or medical examination and employer assessment, if such temporary precautionary conditions are job-related, consistent with business necessity, and in compliance with the duty of reasonable accommodation.[10]

■ Thus, under the West Virginia Human Rights Act, *W.Va.Code*, 5–11–9 [1998],

ability than in past years. *Id.* ... For the last decade, great strides have been made in getting employers to provide return-to-work programs as a benefit to employees. As amply demonstrated, the benefits cannot be understated. Through the use of these types of programs, (1) employer/employee relations have been enhanced; (2) workplace morale has greatly improved; and (3) both the employee and the employer have realized significant financial savings.

We understand and appreciate the concerns that are raised in the brief of the *amici curiae*. Indeed, temporary "light duty" may be one form of reasonable accommodation an employer may offer to an employee. *See W.Va.C.S.R.* 77.4.5.2. We also note that courts have recognized that the protections of the law prohibiting disability discrimination continue to apply to employees who are working in light duty assignments. *See Valdez v. Albuquerque Pub. Sch.*, 875 F.Supp. 740 (D.N.M.1994) *Taylor v. Garrett*, 820 F.Supp. 933 (E.D.Pa.1993).

when undertaken in a good-faith fashion that is consistent with the duty of reasonable accommodation,[11] the use of a light duty program or assignment does not establish disability discrimination, and the mere fact that an employer places an employee on light duty does not prove disability discrimination.

Based on the foregoing reasoning, the instructional language proposed by the Hospital in the instant case, regarding when a medical examination can be required, was both an accurate statement of the law and directly pertinent to the Hospital's defense—because the proposed language told the jury not to draw any adverse inference or conclusion of disability discrimination from the mere fact that the Hospital had required Mr. Stone to have an independent medical examination.

The instructional language proposed by the Hospital stating that the mere fact of placing an employee on light duty does not prove a disability discrimination claim is of the same character as the medical examination language, because it correctly told the jury not to draw an adverse inference or conclusion of disability discrimination from an occurrence that was not in itself illegal.

Based on the foregoing, we agree with the Hospital that the circuit court erroneously gave a charge that did not include correct statements of the applicable law regarding medical examinations and "light duty." Because of this error, the Hospital would be at a minimum entitled to a new trial.

### B.

*The Hospital's Claim of Insufficient Evidence to Establish Protected Status*

#### 1.

*Protected Status under West Virginia Law*

The Hospital claims that Mr. Stone could not invoke the protection of our Human

Rights Act's prohibition against disability discrimination because he did not provide evidence that would allow a jury to conclude that he fit within the statute's threshold "protected person" definitional requirement—of being a "person with a disability."

In Syllabus Point 2 of *Skaggs v. Elk Run Coal Co.*, 198 W.Va. 51, 479 S.E.2d 561 (1996), we stated:

> To state a claim for breach of the duty of reasonable accommodation under the West Virginia Human Rights Act, W.Va.Code, 5–11–9 (1992), a plaintiff must allege the following elements: (1) The plaintiff is a qualified *person with a disability*; (2) the employer was aware of the plaintiff's disability; (3) the plaintiff required an accommodation in order to perform the essential functions of a job; (4) a reasonable accommodation existed that met the plaintiff's needs; (5) the employer knew or should have known of the plaintiff's need and of the accommodation; and (6) the employer failed to provide the accommodation.

(Emphasis added.)

■ Thus, to have the status of being a "protected person" who can assert a claim for disability discrimination, a person must show that he is "a disabled person [or "person with a disability"] within the meaning of the law." *Skaggs v. Elk Run Coal Company*, 198 W.Va. 51, 71 n. 22, 479 S.E.2d 561, 581 n. 22 (1996).

Prior to 1989, our Human Rights Act statute prohibited employment discrimination against an "individual [who] is handicapped;" "handicap" was defined as "any physical or mental impairment which substantially limits one or more of an individual's major life activities." *W.Va.Code*, 5–11–3 and –9 [1981].[12]

Based on this definitional language, in *Chico Dairy Co. v. W. Va. Human Rights Comm'n*, 181 W.Va. 238, 382 S.E.2d 75 (1989), we held that the Human Rights Com-

---

**11.** " ' "[R]easonable [a]ccommodation" means reasonable modifications or adjustments to be determined on a case-by-case basis which are designed as attempts to enable an individual with a disability to be hired or to remain in the position for which he was hired.' 77 W. Va. C.S.R. 1, § 4.4, in part." *Skaggs v. Elk Run Coal*

*Co., Inc.*, 198 W.Va. 51, 65, 479 S.E.2d 561, 575 (1996).

**12.** The terms "handicap" and "disability" are interchangeable in our and most jurisdictions' discrimination jurisprudence; more modern statutes use the term "disability." Modern practice now also gives preference to the wording "per-

mission did not have statutory authority to issue regulations that would give "protected person" status to bring a disability discrimination claim—not only to persons with actual substantially limiting impairments ("actual disability" claims) [13]—but also to persons who did not actually have significantly limiting impairments, but who were regarded, perceived, or treated as having a disability ("regarded-as" claims).

In 1989, the definition of "disability" was amended by our Legislature to expand protected status to make a disability discrimination claim under our Human Rights Act to include not only persons who actually have substantially limiting impairments, but also to persons who have a record of such impairments or who are "regarded as" having such impairments. *W.Va.Code,* 5–11–3(m) [1998].[14]

The regulations implementing the Human Rights Act, *W.Va.Code of State Regulations* 77–1–2.8 [1994] further delineate the definition of "regarded as having an impairment" as meaning:

1. Has a physical or mental impairment that does not substantially limit major life activities but is treated by another as being such a limitation;

2. Has a physical or mental impairment that substantially limits major life activities, only as a result of the attitudes of others toward such an impairment; or,

3. *Has none of the impairments defined above but is treated by another as having such an impairment.*

(Emphasis added.)

This new statutory and regulatory language provides a broader definition—defin-

---

son with a disability," rather than "disabled person"—but both phrases have the same meaning.

**13.** In *Ranger Fuel Corporation v. W.Va. Human Rights Comm'n.,* 180 W.Va. 260, 376 S.E.2d 154 (1988), we stated that West Virginia's pre–1989 "actual disabilities only" statutory definition of "person with a disability" was to be strictly construed for purposes of determining whether a person had protected status to bring a claim under the law. Applying this standard to facts arising under the pre–1989 law, this Court decided a number of cases addressing the issue of "who is a person with a disability?" *See Benjamin R. v. Orkin Exterminating Co.,* 182 W.Va. 615, 390 S.E.2d 814 (1990) (holding that our law prohibiting disability discrimination could be invoked by a person with asymptomatic HIV infection, and recognizing that the 1989 definitional changes broadened the scope of protected status under our disability discrimination law, *id.* at n. 5); *Casteel v. Consolidation Coal Co.,* 181 W.Va. 501, 383 S.E.2d 305 (1989) (rejecting the employer's contention that a coal miner who could do his assigned work with continuous and substantial pain due to degenerative joint disease could not bring a claim, and holding that the protection of our disability discrimination law would not be denied to an employee simply because he had stoically endured the difficulties caused by his medical condition); *Coffman v. W.Va. Bd. of Regents,* 182 W.Va. 73, 386 S.E.2d 1 (1988) (holding that a woman who suffered back pain, who was medically limited to light lifting, and who had problems bending, could make a claim); *Teets v. Eastern Associated Coal Corp., Federal No. 2,* 187 W.Va. 663, 421 S.E.2d 46 (1992) (per curiam) (holding that under pre–1989 law there must be an individualized determination of whether an individual has an actual disability, and reversing a summary judgment

that held that a person did not have protected status to claim discrimination based on a back injury); *Anderson v. Live Plants, Inc.,* 187 W.Va. 365, 419 S.E.2d 305 (1992) (per curiam) (noting the 1989 broadening of the law's scope of coverage, and rejecting the argument that because the employee had successfully worked at delivering pizza, maintaining a graveyard, washing cars, driving a taxi, and performing general labor, he did not have protected status to invoke the protection of disability discrimination laws); *O'Dell v. Jennmar Corp. of W.Va., Inc.,* 184 W.Va. 280, 400 S.E.2d 288 (1990) (coverage of disability discrimination law applicable to pre–1989 facts did not extend to truck driver with back injury, where injury did not in fact limit his return to truck driving).

**14.** *W.Va.Code,* 5–11–3(m) [1998] states:

(m) The term "disability" means:
(1) A mental or physical impairment which substantially limits one or more of such person's major life activities. The term "major life activities" includes functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working;
(2) *A record of such impairment; or*
(3) *Being regarded as having such an impairment.*
For the purposes of this article, this term does not include persons whose current use of or addiction to alcohol or drugs prevents such persons from performing the duties of the job in question or whose employment, by reason of such current alcohol or drug abuse, would constitute a direct threat to property or the safety of others.
(Emphasis added.)

ing who may have protected status as a "person with a disability within the meaning of the law" who can assert a disability discrimination claim—than the pre-1989 law did, including for the first time explicit protection for persons with "regarded-as" disabilities. · See *Fourco Glass Co. v. W.Va. Human Rights Comm'n*, 181 W.Va. 432, 383 S.E.2d 64 (1989).

■ Since 1989, then, under our Human Rights Act, *W.Va.Code*, 5–11–1 *et seq.*, a "person with a disability" within the meaning of the law is a person who has one or more physical or mental impairments that substantially limits one or more major life activities; a person who has one or more physical or mental impairments that does not substantially limit one or more major life activities, but that is treated by others as being such a limitation; a person who has one or more physical or mental impairments that substantially limits major life activities only as a result of the attitudes of others toward such impairment; and a person who has no such impairments, but who is treated by others as having such impairments. *W.Va.C.S.R.* 77–1–2.8 [1994].

Applying the broader post-1989 definition, in *St. Peter v. Ampak–Division of Gatewood Products, Inc.*, 199 W.Va. 365, 484 S.E.2d 481 (1997) (*per curiam*), we rejected the argument that an employee who had injured his shoulder and needed to work a limited schedule because he would need physical therapy was not a protected person under the Human Rights Act, because he was allegedly not "actually limited" in a major life activity. Noting that the 1989 statute was "meant to change the law," we held that the employee, who was fired after his employer said that he was "half a man," could invoke the protection of the Human Rights Act with a "regarded as" disabled claim, without proving that he actually had a substantially limiting impairment. 199 W.Va. at 370, 484 S.E.2d at 486.

■ Thus, West Virginia law, in terms of whether a person is a "person with a disability within the meaning of the law," *Skaggs, supra*, 198 W.Va. at 71 n. 22, 479 S.E.2d at 581 n. 22, who has standing to assert a claim under the protection of our disability discrimination law, has gone from a narrower definition to a broader definition. And under both definitions, whether a person is a "person with a disability within the meaning of the law" is ordinarily an issue of fact for a properly instructed jury or other fact-finder applying the appropriate definitional test set forth in the statute and implementing regulations. *Strawderman v. Creative Label Co., Inc.*, 203 W.Va. 428, 508 S.E.2d 365 (1998) (*per curiam*) (under post-1989 law whether a person with a migraine had an impairment that qualifies as an actual disability was to be determined by the trier of fact); *Teets v. Eastern Associated Coal Corp., Federal No. 2*, 187 W.Va. 663, 421 S.E.2d 46 (1992) (*per curiam*) (under pre-1989-law it was a jury question whether a woman's impairments substantially limited her in her employment.) *See also* cases cited *supra* at note 13.

### 2.

### *Protected Status under Federal Law*

The Hospital cites us to several cases (*see* note 22, *infra*) arising under the federal laws against disability discrimination[15] as authority for the proposition that Mr. Stone did not provide sufficient evidence upon which a jury could conclude that he was a "person with a disability within the meaning of the law;" and that therefore as a matter of law Mr. Stone did not make the threshold "standing" showing of being a person who could assert, invoke, or be covered by the protections of our Human Rights Act.

Initially, we recognize that this Court, because of the similarity of the language in our Human Rights Act and related regulations and the federal laws and regulations that prohibit disability discrimination, has on oc-

---

**15.** The two major federal laws prohibiting disability discrimination, the Americans with Disabilities Act "ADA," 42 U.S.C. 12101 *et seq.*, first enacted in 1990; and Section 504 of the Rehabilitation Act, 29 U.S.C. 794(a), first enacted in 1973—and the regulations issued pursuant to these Acts—use similar or identical language to

identify who may be a protected person who can invoke the protection of these laws. The federal courts have treated both statutes as having essentially the same scope of "protected person" standing. We shall in this opinion refer to cases arising under both statutes as arising under federal law prohibiting disability discrimination.

casion looked to decisions made under those federal laws to assist us in interpreting and applying our own law. *See, e.g., Haynes v. Rhone–Poulenc,* 206 W.Va. 18, 29 n. 14, 32, 521 S.E.2d 331, 342 n. 14 (1999) (stating that the 1989 expansion of the definition of disability was done "to bring the law into line with the federal authorities.")

However, in recent years a number of commentators on disability discrimination jurisprudence in the federal court arena have noted the development of a "startlingly diverse" body of federal case law, particularly in the "protected person" or standing area.[16]

Because the Hospital cites us to several federal disability discrimination cases in support of its argument that Mr. Stone did not as a matter of law submit sufficient evidence to permit a jury to find that he had standing or protected status as a "person with a disability within the meaning of the law" so as to claim the protection of our Human Rights Act—and because our cases to date have looked at federal case law in the disability discrimination area in only a brief fashion— we direct our attention at this juncture to the question of who can make a claim of disability discrimination as that question has been addressed under federal law—in light of the Hospital's argument.

The Hospital argues that under the holdings of several federal cases, many of which have their origin in *Forrisi v. Bowen,* 794 F.2d 931 (4th Cir.1986), Mr. Stone does not have protected status to make a claim of disability discrimination because, says the Hospital, Mr. Stone merely showed that he was excluded from "only one job," and not from a "broad class of jobs." In other words, the Hospital argues that Mr. Stone did not as a matter of law present enough evidence for a jury to find that he was perceived or treated by the Hospital as having an impairment that would, as perceived, substantially limit his life activity of working.

In *Forrisi,* the plaintiff, a utility repairman, had told his employer that he was afraid of heights, and so he was discharged— because he could not do utility repairs at a certain altitude due to that fear of heights. The court held that Mr. Forrisi could not invoke the disability discrimination laws—not even the "regarded as disabled" protection— because he was seen by his employer as being "unsuited for one position in one plant—and nothing more." 794 F.2d at 935. The court noted that his employer "never doubted Forrisi's ability to work in his chosen occupation[.]"[17] *Id.*

The "exclusion-from-only-one-job" rationale that the *Forrisi* court relied upon to say that the plaintiff in that case could not as a matter of law establish threshold protected status under federal disability discrimination law has been relied upon in some federal cases to deny threshold protected status as a matter of law to a range of persons with fairly substantial impairments.[18]

---

**16.** The judicial response to a large number of issues arising under the ADA has been startlingly diverse. On issue after issue, the circuit courts of appeal are split and/or are in disagreement with the EEOC ... This wide divergence of opinion illustrates some very different viewpoints concerning the purposes and objectives of the ADA.

Befort, Stephen F. and Thomas, Holly Lindquist, "The ADA in Turmoil: Judicial Dissonance, The Supreme Court's Response, and the Future of Disability Discrimination Law," 78 *Oregon.L.Rev.* 27, 30 (1999) (arguing that the Supreme Court is providing "more opportunities for the lower courts to head off in a dizzying variety of directions." *Id.* at 104, 400 S.E.2d 288.) *See also* Comment, "The Supreme Court– Leading Cases," 113 *Harvard L.Rev.* 200, 300 ns.3 & 4 (1999) ("Many commentators express disapproval at how the threshold 'disability' question often consumes ADA cases" (citations omitted).) *See also* Crossley, Mary, "The Disability Kaleidoscope," 74 *Notre Dame L.Rev.* 621

(1999). *See also* Sutter, Luther, "The Americans With Disabilities Act of 1990: A Road Now Too Narrow," 22 *U.Ark. Little Rock L.Rev.* 161 (2000). *See also* Comment, "Too Disabled or Not Disabled Enough: Between A Rock and A Hard Place After *Murphy v. United Parcel Service, Inc.,*" 39 *Washburn L.J.* 255 (2000). *See also* Burgdorf, Robert L., Jr., " 'Substantially Limited' Protection From Disability Discrimination: The Special Treatment Model and Misconstructions of the Definition of Disability," 42 *Vill.L.Rev.* 409 (1997).

**17.** The actual situation of the plaintiff in *Forrisi* thus can be distinguished from the situation of Mr. Stone, who was in fact excluded (temporarily, it turned out) from performing his "chosen occupation" of ambulance paramedic.

**18.** Looking at a number of federal cases citing the "only-one-job" rationale for denying a person the right to claim protected status, one commentator stated:

 In this regard, it should be remembered that if a person is prohibited from establishing threshold "protected status" as a person with a disability within the meaning of the law, an employer may inflict any sort of (otherwise legal) discriminatory conditions or acts on the person—no matter how unfair, arbitrary, stereotyped, bigoted, or unrelated to business necessity that those acts or conditions may be—and the person will have no standing to complain of or remedy the discrimination. And it should also be remembered that establishing the "protected person" status of being a "person with a disability within the meaning of the law," who has standing to make a claim, in no way guarantees that a claim of disability discrimination will succeed. All other elements of a claim, such as a discriminatory adverse employment action, qualification to do the job, lack of reasonable accommodation, etc., must be shown before a person is entitled to any relief.

An example of how this "only-one-job" approach has been relied upon in some federal cases to deny persons as a matter of law the right to present a disability discrimination claim to a court is *Chandler v. City of Dallas*, 2 F.3d 1385 (5th Cir.1993).

> [R]estrictions on the term "disability," imposed in the name of reserving the protection of the statute for "the truly disabled," have caught many plaintiffs with serious, highly disabling conditions in their webs. The exclusion-from-one-job-is-not-enough formula has resulted in, or contributed to, the dismissal of ADA or section 504 of the Rehabilitation Act claims by plaintiffs with, among others, the following kinds of impairments: replacement of hips and shoulders (as a result of avascular necrosis); diabetes; cancer; laryngectomy (removal of larynx); hemophilia; heart attack; absence of one eye; degenerative hip disease resulting in a limp; permanent severe limitations in use of the right arm and shoulder; various serious back injuries; depression and paranoia; a six-inch scar on the face resulting in supervisors calling the employee "scarface;" "bilateral carpal tunnel syndrome;" asthma; asbestosis; HIV infection; traumatic brain injury resulting in vision limitations, memory deficiencies, problems with verbal fluency, problems abstracting and motor deficits; and stroke resulting in the loss of use of the left hand, arm and leg. The individuals who had these conditions hardly fit the *Forrisi* image of someone "whose disability was minor and

In *Chandler*, city policy excluded insulin-dependent diabetics and a large class of persons with various vision impairments (that were corrected with glasses), *per se*, from city driving jobs. The 5th Circuit held that as a matter of law the plaintiffs were unable to challenge these blanket policies as unfairly discriminatory—because the court held that "driving" was a single job function. The court held that no finder of fact could permissibly conclude that the plaintiffs were regarded as being substantially limited in their major life activity of working, by being treated as being unable to drive safely.

In another example of this restrictive approach, *Bridges v. City of Bossier*, 92 F.3d 329 (5th Cir.1996), a fire department applicant with a mild form of hemophilia (also an EMT in the National Guard) was denied employment. The appeals court held that he did not have standing to bring a disability discrimination claim—because the court believed that as a matter of law, exclusion from firefighting, EMT, and paramedic jobs was not a substantial limitation of the major life activity of working.[19]

As we have noted, the commentators on federal jurisprudence in the disability discrimination area have noted a state of "turmoil and diversity." *See* note 17, *supra*. In

> whose relative severity of impairment was widely shared." [But t]hey never had the opportunity to litigate their contentions that their employers had engaged in illegal discrimination against them.
> *Burgdorf, supra*, at 539–541 (footnotes omitted).

19. A recent example of this highly restrictive "protected status" approach is *Duncan v. Washington Metropolitan Area Transit Authority*, 201 F.3d 482 (D.C.Cir.2000), *opinion vacated and en banc argument ordered*, March 31, 2000, 2000 WL 360095. In *Duncan*, a circuit court panel reversed a jury verdict for the plaintiff in an ADA case, on the rationale that a plaintiff who suffered a back injury and significant lifting restrictions, and who was excluded from his job with the transit authority, did not provide evidence (presumably through vocational experts) to "demonstrate what jobs were available to unskilled workers in his geographic area." *Id.* at 488. Chief Justice Edwards stated in his dissent to the panel decision: "This rigid formulation [of the only-one-job approach would] virtually ensure[ ] that very few plaintiffs will ever prevail under the ADA in this circuit."

*Id.* at 497.

contrast to the approach taken in the forego-ing federal cases—the approach that the Hospital argues that we should take—in a number of other federal cases, a person was able to go before a finder of fact to show that by being excluded from a particular job they had been regarded, perceived or treated as a person with a substantially limiting impair-ment—so as to be able to go before a jury with their claim of disability discrimination.

For example, in *Cook v. State of Rhode Island,* 10 F.3d 17 (1st Cir.1993), the appel-late court considered a claim by an employer that the plaintiff, who had prevailed in a jury verdict, had not shown that employer had treated her as if her condition substantially limited her major life activity of working. The *Cook* court stated:

> [W]e think the degree of limitation fell squarely to the jury and that the evidence warrants its finding that appellant regard-ed plaintiff as substantially impaired.

> \* \* \* \* \* \*

> The Rehabilitation Act seeks not only to aid the disabled, but also to "eliminate discrimination on the basis of handicap." [citation omitted]

> \* \* \* \* \* \*

> [D]enying an applicant even a single job that requires no unique skills, due solely to the perception that the applicant suffers from a physical limitation that would keep her from qualifying for a broad spectrum of jobs, can constitute treating an applicant as if her condition substantially limited a major life activity, *viz,* working.

> \* \* \* \* \* \*

There is a significant legal distinction between rejection based on a job-specific perception that the applicant is unable to excel at a narrow trade and a rejection based on more generalized perception that the applicant is impaired in such a way as would bar her from a large class of jobs. [citation omitted]

*Id.* at 25–26.

In another case, *Deane v. Pocono Medical Center,* 142 F.3d 138 (3d Cir.1998), the dis-trict court granted summary judgment against a woman who claimed disability dis-crimination based on a perceived disability. The plaintiff in *Deane,* echoing Mr. Stone's claims in the instant case, claimed that her employer had acted on the basis of misper-ceptions as to her limitations, misperceptions that were the result of a " 'snap judgment' arrived at without making a good faith analy-sis, investigation, or assessment of the nature of her injury." 142 F.3d at 142.

In *Deane,* the district court had held that the plaintiff could not invoke the ADA be-cause, *inter alia,* her employer "regarded her impairment as limiting only her ability to work as a nurse on the surgical/medical floor, not her ability to work as a nurse in gener-al...." 142 F.3d at 144. The Circuit Court of Appeals disagreed with the district court's rationale, holding that there was "sufficient evidence to create a genuine issue of material fact as to whether [her employer] regarded her as substantially limited in the major life activity of working.... [including] deposition testimony ... documenting confusion as to the extent of Deane's physical capacity, with regard to pushing, pulling, and lifting." 142 F.3d at 144–145.[20]

---

**20.** For additional less restrictive federal cases, *see, e.g., Doe v. New York Univ.,* 666 F.2d 761 (2d Cir.1981), where the court stated, with regard to the definition of "disability" that is central to a person's ability to invoke the protection of the law against disability discrimination, "the defini-tion is not to be construed in a niggardly fash-ion." 666 F.2d at 775. *See also Heyman v. Queens Village Committee for Mental Health,* 198 F.3d 68 (2d Cir.1999) (it was a proper jury ques-tion whether an employer believed that a per-son's cancer would "reduce significantly his abil-ity to work" 198 F.3d at 73); *Olson v. General Electric Astrospace,* 101 F.3d 947 (3d Cir.1996) (it was properly a question for the jury whether the employer's actions toward the plaintiff

amounted to regarding the plaintiff as having a disability, due to the plaintiff's previous illness-related absences and hospitalizations); *Cline v. Wal–Mart Stores, Inc.,* 144 F.3d 294 (4th Cir. 1998) (a jury could properly find that an employ-ee who was demoted following surgery for a brain tumor from a maintenance supervisory po-sition was regarded by his employer as substan-tially limited in his ability to perform "jobs doing the type of work that plaintiff has chosen as his field," 144 F.3d at 303, *quoting Gupton v. Com. of Va.,* 14 F.3d 203, 205 (4th Cir.1994)); *Taylor v. Pathmark Stores, Inc.,* 177 F.3d 180 (3d Cir. 1999) (a grocery store employee could invoke the protections of the ADA where the employer treat-ed the employee as impaired due to difficulties in

Summing up the foregoing discussion, it seems clear that the commentators are correct in identifying a diverse body of federal disability discrimination law—with some cases taking a highly restrictive approach to the question of who may go before a jury to seek to prove that they are a person with a disability within the meaning of the law—and other cases taking a less restrictive approach.[21]

■ Based on the foregoing discussion, we recognize that the West Virginia Human Rights Act, as created by our Legislature and as applied by our courts and administrative agencies, represents an independent approach to the law of disability discrimination that is not mechanically tied to federal disability discrimination jurisprudence.[22]

### 3.

### *Protected Status under Other State Laws Against Disability Discrimination*

Of course, other states have legislation like our Human Rights Act that affords indepen-

---

walking and standing, and it was a question for the jury as to whether the employer's actions were reasonably related to a business necessity); *McInnis v. Alamo Community College District*, 207 F.3d 276 (5th Cir.2000) (a federal district court held that a teacher with slurred speech and a disturbed gait due to a head injury could not invoke the protections of the ADA, because he was neither disabled nor regarded as disabled; the appeals court reversed, holding that it was an individualized, fact-specific issue for the jury whether the employer treated the teacher as having a substantially limiting impairment); *Fjellestad v. Pizza Hut of America*, 188 F.3d 944 (8th Cir.1999) (a store manager who was injured in a car accident and had limitations on her use of her upper arms had protected status to invoke and request reasonable accommodation under the ADA). *See also Thornhill v. Marsh*, 866 F.2d 1182 (9th Cir.1989), where an employee was permitted to bring a claim for disability discrimination when the employer regarded him as having significant and back-related lifting limitations. *See also Cole v. Staff Temps*, 554 N.W.2d 699 (Iowa 1996), the court (applying the ADA) held that an employee who had suffered a back injury, but who was not actually impaired and who had obtained a full release from her doctor, could invoke the protections of disability discrimination law—because she was regarded as having a substantial impairment. The court said that a person is " 'regarded as having an impairment' that substantially limits the person's major life activities when other people treat that person as having a substantially limiting impairment." 554 N.W.2d at 704 (citations omitted). *See also* Mayerson, Arlene B., "Restoring Regard For the 'Regarded As' Prong: Giving Effect to Congressional Intent," 42 *Vill.L.Rev.* 587 (1997).

**21.** It should also be noted that differences between our developing disability discrimination jurisprudence and federal jurisprudence already appear to have developed in several areas. *Compare, e.g., Benjamin R. v. Orkin Exterminating Co.*, 182 W.Va. 615, 390 S.E.2d 814 (1990) (a person with asymptomatic HIV infection is a person with a disability who has standing to invoke disability discrimination laws) *with Run-*

*nebaum v. NationsBank*, 123 F.3d 156 (4th Cir. 1997) (a person with asymptomatic HIV infection does not have protected status to invoke disability discrimination laws) *and with Bragdon v. Abbott*, 524 U.S. 624, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998) (*some* persons with asymptomatic HIV infection may be able to invoke the protection of disability discrimination laws); *compare also Myers v. Hose*, 50 F.3d 278, 284 (4th Cir.1995) (stating that in the Fourth Circuit, reassignment to a vacant position is not a form of reasonable accommodation) *with* Syllabus Point 4 of *Skaggs v. Elk Run Coal Co., Inc.*, 198 W.Va. 51, 479 S.E.2d 561, (1996) (Justice Cleckley writing for the Court, holding that reassignment to a vacant position *may* in a given case be a form of reasonable accommodation); *compare also Haynes v. Rhone–Poulenc*, 206 W.Va. 18, 521 S.E.2d 331 (1999) (holding that a temporarily totally disabled person may invoke protection under disability discrimination laws) *with McDonald v. Pennsylvania*, 62 F.3d 92 (3d Cir.1995) (a nurse recovering from abdominal surgery was held not able to invoke the ADA, because her inability to work was not permanent).

**22.** In this regard, we have reviewed the federal cases that are presented by the Hospital in support of their contention that Mr. Stone was as a matter of law unable to claim protected status under our Human Rights Act—because the Hospital treated him as being unfit for only "only one job." We do not find these cases to be persuasive authority for that contention. For example, the Hospital cites us to *Duncan v. State of Wisconsin Dept. of Health & Family Services*, 166 F.3d 930 (7th Cir.1999), where the employee was a youth counselor at a correctional facility. While assigned to a gang unit he lost his temper several times. He was transferred to a different unit to do his same counselor work and referred to a psychiatrist, who concluded that his outbursts of temper posed limitations on his ability to be a counselor unless he learned anger control skills. He refused to take any classes and was fired. Duncan claimed that his employer perceived him as mentally disabled. The district court dismissed this claim, and the appellate court affirmed, noting the fact that his employer

dent state-law protection against disability discrimination. At this juncture, we turn to a brief examination of several cases arising under such state laws that are pertinent to the issues that we are addressing.

In *Office of Occupational Medicine v. Baltimore Community Relations Commission*, 88 Md.App. 420, 594 A.2d 1237 (1991), the court held that a fire fighter job applicant could invoke the jurisdiction of the state law against disability discrimination, when an employer perceived him to have a possible future disability due to a bullet that was lodged in his spine. The applicant was a military veteran who was not actually impaired by the bullet. The court said that the finder of fact could permissibly conclude that the employer had treated the applicant as having a possible future impairment that could "impair major life activities, *e.g.*, earning a living." 88 Md.App. at 429, 594 A.2d at 1242.[23]

did not actually change his counselor job duties, but merely transferred him to a "slightly different" environment. *Id.* at 935. This situation is in contrast to Mr. Stone's situation, where he was removed from performing the duties he had been performing in the field with patients, and placed in an office setting with quite different duties. In another case cited by the Hospital, *Muller v. Auto. Club of S. Cal.*, 897 F.Supp. 1289 (S.D.Cal.1995), an employee alleged that she developed post-traumatic stress disorder following threats that were made to her at work. While on layoff, she asked for certain safety procedures at work but was unable to agree on them with her employer, and she did not return to work. Her own psychologist concluded that her future employment in similar employment settings was not impaired—only her returning to the Auto Club, due to specific fears at that location because of the past incidents. The Auto Club offered to help her get vocational training, but never suggested that it viewed her as being limited in performing her same job for a different employer. On this record, the federal district court granted summary judgment against Ms. Muller on the grounds that she was not actually substantially limited in her major life activity of working and that she was not treated by her employer as being so limited. This is in contrast with Mr. Stone, who showed that the Hospital treated him as being at least temporarily unfit for driving and lifting, two major components of his regular job and of many jobs. Mr. Stone was treated as if he had an impairment that would have limited or even foreclosed his performing the same work for other ambulance companies, in contrast to Ms. Muller, who could have performed the same work but for another employer. In a third case to which the Hospital directs us, *Fuqua v. Unisys Corp.*, 716 F.Supp. 1201 (D.Minn.1989), the employee was a general laborer. He was temporarily laid off by his employer on the grounds that he was, for 13 months, perceived by his employer as unable to safely bend his back, twist his back, lift from the floor, or do overhead work. Although the opinion in *Fuqua* is somewhat confusing, the district court held *inter alia* that the employer did not perceive or treat the employee as having a condition that would substantially limit his employment, so the plaintiff had no protected status to invoke the law against disability discrimination. We cannot agree with the court's reasoning in *Fuqua*, because we believe

(and our cases indicate) that for a general laborer, an inability to safely lift, bend, twist, and do overhead work is something that a fact-finder could see as a substantially limiting impairment. In a fourth case, *Jasany v. U.S. Postal Service*, 755 F.2d 1244 (6th Cir.1985), a federal district court, apparently acting as a fact-finder, held that a postal employee did not have protected status to claim disability discrimination because his "cross-eyed" condition only prohibited him from using one machine, and there were many other positions he could fill. The court did not address "regarded-as" protected status, which distinguishes *Jasany* from Mr. Stone's case.

**23.** *See also City of LaCrosse Police & Fire Commission v. Labor and Industry Review Commission*, 139 Wis.2d 740, 407 N.W.2d 510 (1987), where a job applicant was denied eligibility for a job because of perceived "back deficiencies which possibly would not permit him to perform physical duties required of a ... police officer." 139 Wis.2d at 748, 407 N.W.2d at 513. The court held that the applicant, who had no actual physical limitations, was nevertheless entitled to invoke the protections of state law against "regarded as" disability discrimination. In *Colorado Civil Rights Commission v. N. Washington Fire Protection District*, 772 P.2d 70 (1989), the Colorado Supreme Court held that applicants for firefighter positions could invoke the protection of state law against disability discrimination. Some of the applicants had prior orthopedic injuries that were not currently disabling, but which the employer perceived as making the applicants ineligible. The Colorado court said that "the District [claims that it] did not treat the applicants as being substantially limited in one or more of their major life activities, but rather as being limited only with regard to specific job-related functions and risks of fighting fires. We find this argument irrelevant to the question of whether an applicant is handicapped ... by virtue of an erroneous perception of handicap." 772 P.2d at 78. In *City of Cleveland v. Ohio Civil Rights Commission*, 98 Ohio App.3d 243, 648 N.E.2d 516 (1994), the employer argued that an aspiring firefighter could not invoke the coverage of state law prohibiting disability discrimination, where the firefighter had a congenital malformation that prevented him from closing his right eyelid. The employer argued that despite the fact that the employer viewed the applicant's eye

In summary, there is substantial authority in state disability discrimination law for the approach to "protected person" status that we have seen in our state law and in some federal cases.

### 4.

*Did Mr. Stone Submit Sufficient Evidence to Permit A Jury to Find That He Had Standing to Assert A Claim for Disability Discrimination?*

We now apply the foregoing principles to the Hospital's claim that Mr. Stone did not present sufficient evidence for a jury to find that he was treated as having a substantially limiting impairment so as to be "a person with a disability within the meaning of the law" who could assert a claim under our Human Rights Act.

The Hospital argues that the Hospital only "suspected" the possibility of Mr. Stone having a problem that limited his ability to safely perform the "single job" of ambulance paramedic. The Hospital also argues that as a matter of law, the jury could not find that any limitations that the Hospital "suspected" were, as suspected, "disabilities"—because, as suspected or perceived, these limitations did not substantially limit Mr. Stone in his major life activity of working.

We do not find this argument by the Hospital to be persuasive. Despite what the Hospital *said* about their subjective view of Mr. Stone, the jury was entitled to look at what the Hospital *did*.[24]

The Hospital treated Mr. Stone (temporarily, it turned out, although this was by no means certain when he was transferred) as a person who should not be entrusted with the duties of his regular job— including driving a vehicle, and caring for, lifting, and carrying patients. The limitations or restrictions that the Hospital regarded as appropriate for Mr. Stone were certainly of sufficient magnitude and breadth— taking him off all of his regular duties and prohibiting him from driving, providing patient care, lifting, and carrying—for a jury to conclude that Mr. Stone was treated as being substantially limited in his major life activity of working. The jury was instructed in exactly these terms, and the jury found, *inter alia*, that Mr. Stone was a person with a disability within the meaning of the law who had established his threshold standing to bring a disability discrimination claim. The evidence was sufficient to permit the jury to make this finding. *See St. Peter v. Ampak– Division of Gatewood Products, Inc.*, 199 W.Va. 365, 484 S.E.2d 481 (1997) (*per cu-*

---

condition as a bar to the job, the employer did not view the applicant's eye condition as a "handicap." The court rejected this argument, holding that the employer's reliance on the perceived disqualifying condition allowed the employee to invoke the law against disability discrimination. *See also AT & T Technologies, Inc. v. Royston*, 772 P.2d 1182 (Colo.App.1989) (under state law a person who had a muscle strain in his back that caused him pain, required him to avoid heavy lifting and carrying, and restricted the use of his arms, was qualified to invoke the law against disability discrimination); *Cisco Trucking Co., Inc. v. Human Rights Comm'n.*, 274 Ill.App.3d 72, 210 Ill.Dec. 791, 653 N.E.2d 986 (1995) (truck driver who had injured his back and was laid off was permitted to invoke the protection of the state disability discrimination law because the layoff was allegedly based on a perceived physical handicap); *Turner v. City of Monroe*, 634 So.2d 981 (La.Ct.App.1994) (an employee who was treated as unable to return to his job as a signal technician following back surgery, after his treating physician had given him a clean bill of health, could invoke the protection of state law against disability discrimination); *American National Insurance Company v. Fair Employment and Housing Commission*, 32 Cal.3d 603, 609, 651 P.2d 1151, 1155, 186 Cal.Rptr. 345, 349 (1982) ("The law clearly was designed to prevent employers from acting arbitrarily against physical conditions that, whether actually or potentially handicapping, may present no current job disability or job-related health risk."); *Howell v. Merritt Company*, 585 N.W.2d 278 (Iowa 1998) (it was a jury question whether an employer terminated an employee in part because of a perception of disability associated with her use of a TENS device for back pain); *Katz v. City Metal Co., Inc.*, 87 F.3d 26 (1st Cir.1996) (applying state and federal law, holding that while it was a close question whether the plaintiff was "actually disabled" by his heart condition, he could invoke law against disability discrimination where he showed that his employer treated him as having a substantially limiting condition).

24. Cf. *Skaggs v. Elk Run Coal Co., Inc.*, 198 W.Va. 51, 79, n. 21, 479 S.E.2d 561, 589 n. 21 (1996) ("Gone are the days (if, indeed, they ever existed) when an employer would admit to firing an employee because she is a woman, over forty years of age, disabled or a member of a certain race or religion.")

*riam* ); *Strawderman v. Creative Label Co., Inc.*, 203 W.Va. 428, 508 S.E.2d 365 (1998) (*per curiam* ); *Teets v. Eastern Associated Coal Corp., Federal No. 2*, 187 W.Va. 663, 421 S.E.2d 46 (1992) (*per curiam* ); *Deane v. Pocono Medical Center*, 142 F.3d 138 (3d. Cir.1998); *McInnis v. Alamo Community College District*, 207 F.3d 276 (5th Cir.2000); *Heyman v. Queens Village Committee for Mental Health*, 198 F.3d 68 (2d Cir.1999); *Office of Occupational Medicine v. Baltimore Community Relations Commission*, 88 Md.App. 420, 594 A.2d 1237 (1991); *Cole v. Staff Temps*, 554 N.W.2d 699 (Iowa 1996); *AT & T Technologies, Inc. v. Royston*, 772 P.2d 1182 (Colo.App.1989); *Cisco Trucking Co., Inc. v. Human Rights Comm'n.*, 274 Ill.App.3d 72, 210 Ill.Dec. 791, 653 N.E.2d 986 (1995); *Turner v. City of Monroe*, 634 So.2d 981 (La.Ct.App.1994); *Howell v. Merritt Company*, 585 N.W.2d 278 (Iowa 1998).[25]

Upon the foregoing reasoning, we conclude that Mr. Stone made a sufficient showing that he was regarded, perceived, or treated as having a substantially limiting impairment so as to allow the jury to find that he was a "person with a disability within the meaning of the law" who could claim the protection of the Human Rights Act against illegal discriminatory action related to such status. The Hospital's assignment of error in this regard is not meritorious.

### C.

*The Hospital's Claim of Insufficient Evidence of Illegal Discriminatory Action in the Hospital's Imposing a "Light Duty" Assignment*

▮▮▮▮ As we have previously held herein, the law recognizes the right of an employer to take reasonable job-related precautions in a fashion that is consistent with the duty of reasonable accommodation, while inquiring or obtaining medical information about an employee's fitness for duty. Thus, the mere

fact that the Hospital sent Mr. Stone for an independent medical examination did not prove a case of disability discrimination—nor did the mere fact that he was placed in a "light duty" assignment while he was awaiting such an examination and its results prove a case of disability discrimination.

The Hospital argues that based on its right to take such precautions, even if Mr. Stone had protected status as a "person with a disability within the meaning of the law," what the Hospital did was permissible.

Mr. Stone, however, points to the fact that the Hospital chose to not even consult several of their own doctors who had examined Mr. Stone (including the chief of their medical staff); to the fact that the Hospital chose to not exercise their right to require drug testing; and to the fact that the the Hospital invoked its "light duty" policy in an unprecedented fashion and against the advice of an employee's personal physician. Mr. Stone argues that these facts, if proven, constituted evidence from which a jury could find that the Hospital had acted in bad faith, unreasonably, in a fashion that was not job-related and was inconsistent with business necessity, and/or was violative of the duty of reasonable accommodation.

We are not unmindful of the equitable and legal force of Mr. Stone's contentions. Indeed, the Hospital in its briefs concedes that a jury could find that these were "bad" decisions by the Hospital. However, the Hospital asserts—and we agree—that there are strong countervailing equitable and legal considerations.

Chief among these is · the fact that Mr. Stone was continued at his full ambulance paramedic rate of pay as a dispatcher, despite the fact that the regular pay for dispatchers was less than the pay rate for ambulance paramedics. Upon our review of the record, the evidence that Mr. Stone was actually forced to work fewer hours as a dispatcher—so that he necessarily lost a signifi-

---

**25.** The Hospital also suggests that because Mr. Stone stated that he suspected that an irrelevant personal animus against him (related to his divorce action) contributed to the Hospital's decision to transfer him to a dispatcher position, the Hospital cannot be found to be liable for disability discrimination under the Human Rights Act.

However, the Act protects persons who are discriminatorily *treated* as having a substantially limiting impairment. *W.Va. C.S.R.* 77–1–2.8. This component of the Act's prohibitions is an objective test that does not focus on the subjective motivation behind the behavior in question, but on the behavior itself.

cant amount of money while he worked as a dispatcher—was slim. The evidence tended to show that had Mr. Stone wished to he could have received essentially the same wages during the 4 months that he worked as a dispatcher that he as a driver, albeit with a bit more effort. In this regard, we observe that Mr. Stone's major complaint in his testimony at trial was not the fact that he lost money by being required to work as a dispatcher—but the fact that his job, in which he took a great deal of pride and satisfaction, was "changed"—as he saw it, in an unfair fashion.

Finally, it is worth comparing Mr. Stone's complaint with the complaints of the plaintiffs in the numerous disability discrimination cases that we have examined in this opinion. We do not believe that any of those plaintiffs—even the unsuccessful ones—were complaining of a temporary transfer to another job at the same rate of pay, and with no long-term or permanent job detriment, pending the outcome of a medical examination that was facially justified.[26]

Understanding the considerations on both sides, we must make our decision in this case in a fashion that reflects the law's due regard for the need of employers to respond flexibly to perceived or suspected impairments in a fashion that promotes employee and workplace safety without violating the law's prohibitions against disability discrimination.

■ Based on all of the foregoing, we believe that under the facts of this case, a temporary transfer of an employee to another suitable full-time position, at the employee's regular rate of pay and without any long-term or permanent detriment to the employee, pending the results of an otherwise permissible medical examination related to a perceived or suspected mental or physical impairment, and absent otherwise egregious circumstances, is not prohibited disability discrimination under our Human Rights Act, *W.Va.Code*, 5–11–1 *et seq.*

Applying this conclusion to Mr. Stone's claim, we conclude that he presented insuffi-

cient evidence to sustain a jury finding of illegal disability discrimination. Consequently, the circuit court's judgment must be reversed, and this matter remanded for entry of judgment for the Hospital.

## V.

### *Conclusion*

The judgment in this case is reversed.

Reversed.

SCOTT, Justice, concurring:

I am in full agreement with the ultimate conclusion reached by the majority; however, there was simply no reason for the majority to embark on the lengthy discussion (approximately thirteen pages of the opinion) of federal and state law from other jurisdictions to reach that conclusion. A more direct and succinct review of our existing statutes and corresponding state regulations clearly allows the Appellee to bring the action he did. *See* W. Va.Code § 5–11–3(m) (1998) and W. Va.C.S.R. § 77–1–2.8 (1994). Likewise, the provisions of West Virginia Code § 5–11–9 (1998) clearly support the fact that, in this case, the Appellant's use of a light duty program was insufficient to prove that the employer had engaged in illegal disability discrimination.

Accordingly, there is no legal justification for the majority's disavowal of a longstanding practice of this Court to follow federal law in discrimination cases. After all, our statutes concerning discrimination are largely modeled after federal statutes. Thus, the pattern and practice of this Court have been to follow the federal courts' interpretation of various statutory provisions, except where there are substantive distinctions between the language used in the state statute as compared with the federal statute. This practice has been recognized by the Court in *Barefoot v. Sundale Nursing Home*, 193 W.Va. 475, 457 S.E.2d 152 (1995), *holding modified on other grounds by Dodrill v. Nationwide Mut. Ins. Co.*, 201 W.Va. 1, 491 S.E.2d 1 (1996), wherein we stated that "[w]e

---

**26.** We do not understand Mr. Stone to argue that the examination by the specialist was in itself illegal.

have consistently held that cases brought under the West Virginia Human Rights Act, W.Va.Code, 5–11–1, *et seq.*, are governed by the same analytical framework and structures developed under Title VII, at least where our statute's language does not direct otherwise." 193 W.Va. at 482–83, 457 S.E.2d at 159–60 (citing *West Virginia University v. Decker*, 191 W.Va. 567, 573, 447 S.E.2d 259, 265 (1994)(adopting disparate impact test established by United States Supreme Court in interpreting Title VII of the Civil Rights Act of 1964 "simply because uniformity in these matters is valuable *per se*"); *Conaway v. Eastern Associated Coal Corp.*, 178 W.Va. 164, 169, 358 S.E.2d 423, 428 (1986) (deciding requirements necessary for age discrimination case and acknowledging that "most courts have looked to *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) (a race discrimination case) for authority")); *see also Health Management, Inc. v. Lindell*, 207 W.Va. 68, 71 n. 4, 528 S.E.2d 762, 765 n. 4 (1999); *West Virginia Human Rights Comm'n v. Wilson Estates, Inc.*, 202 W.Va. 152, 158, 503 S.E.2d 6, 12 (1998);[1] *Hanlon v. Chambers*, 195 W.Va. 99, 112, 464 S.E.2d 741, 754 (1995). "Where, however, there are substantive distinctions between the language used by the two statutes, we have inferred a State legislative intent to diverge from the federal law and have ruled accordingly." 193 W.Va. at 483, 457 S.E.2d at 160 n. 9. (citing *Chico Dairy Co. v. West Virginia Human Rights*

*Comm'n*, 181 W.Va. 238, 382 S.E.2d 75 (1989); *West Virginia Human Rights Comm'n v. United Transp. Union, Local 655*, 167 W.Va. 282, 280 S.E.2d 653 (1981)).

Based upon our well-established practice, I am, therefore, perplexed by dicta in the majority opinion that this Court has only followed federal law in the discrimination arena "on occasion." To the contrary, this Court has routinely looked to and followed federal law when interpreting and applying statutes relating to discrimination.

I am further concerned by dicta in the majority opinion which "recognize[s] that the West Virginia Human Rights Act, as created by our Legislature and as applied by our courts and administrative agencies, represents an independent approach to the law of disability discrimination that is not mechanically tied to federal disability discrimination jurisprudence." This dicta could be interpreted by readers as suggesting that we reject in wholesale fashion the historical approach taken by this Court in looking to federal discrimination law for guidance where the statutory language at issue is substantially similar. *See Barefoot*, 193 W.Va. at 482, 457 S.E.2d at 159. The dicta, however, is just that. It is not a holding by this Court and should not be interpreted as such. I, therefore, suggest that both the circuit courts and the Bar continue to utilize this Court's well-established practice of following

---

1. The precedent of this Court following federal discrimination law was well-documented in *Wilson Estates*, wherein we acknowledged that

 [t]his Court has consistently looked to federal discrimination law dealing with Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e to e–17 (1994) when interpreting provisions of our state's human rights statutes. *Barefoot v. Sundale Nursing Home*, 193 W.Va. 475, 482, 457 S.E.2d 152, 159 (1995) (noting that "cases brought under the West Virginia Human Rights Act are governed by the same analytical framework and structures developed under Title VII, at least where our statute's language does not direct otherwise"); *West Virginia University v. Decker*, 191 W.Va. 567, 573–74, 447 S.E.2d 259, 265–66 (1994) (altering disparate impact test previously established based on 1991 amendments to Title VII which shifted burden of production and persuasion to employer to prove that particular employment practice or policy is "job related" and "consis-

tent with business necessity"); *Slack v. Kanawha County Housing and Redevelopment Auth.*, 188 W.Va. 144, 153–55, 423 S.E.2d 547, 556–558 (1992) (defining elements of constructive discharge cases by adopting majority view of federal decisions decided under both Title VII and Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.*); *Frank's Shoe Store v. Human Rights Commission*, 179 W.Va. 53, 58–59, 365 S.E.2d 251, 256–57 (1986) (citing Pregnancy Discrimination Act amendment to Title VII and United States Supreme Court decision interpreting that amendment as basis for holding that discrimination based upon pregnancy constitutes illegal sex discrimination under West Virginia Human Rights Act); *see also Paxton v. Crabtree*, 184 W.Va. 237, 250, 400 S.E.2d 245, 258 n. 26 (1990) (observing that "we have adopted federal precedent when we believed it was compatible with our human rights statute").

 202 W.Va. at 158, 503 S.E.2d at 12.

federal discrimination law where statutory language is substantially similar.

McGRAW, Justice, concurring in part, and dissenting in part:

(Filed Oct. 20, 2000)

A.

*Errors in the Majority Opinion*

I dissent to parts IV.A and C of the majority opinion. In part IV.A, the majority concludes that the jury—based upon instructions given by the trial court—could have acted under the misapprehension that a mere assignment to light duty proved disability discrimination. However, the record does not contain anything to suggest that this was the case. The entire thrust of the competing arguments of plaintiff's and defendants' counsel was directed at whether or not the defendants acted in good faith and in accord with business necessity. If the plaintiff had at any time contended that a mere transfer to light duty proved disability discrimination, then the defendants' requested instructions might have been necessary. But the circuit court was well within its discretion in refusing to give instructions that were not related to the actual issues being tried to the jury. Put simply, this jury was not misled as to the applicable law.

In Part IV.C, the majority opinion concludes that the jury could not find discrimination under the facts of this case—taking all of the evidence in the light most favorable to the plaintiff. This is an improper conclusion. The jury was fully entitled to decide that the Hospital's light duty assignment for Mr. Stone was made in bad faith and without business necessity. The apparently self-serving testimony of Hospital personnel about how they treated Mr. Stone clearly caused the Hospital's case to founder at trial. Mr. Stone lost a substantial amount of money as a result of his involuntary transfer. Based on the "slim" evidence that the majority concedes existed, the jury was entitled to conclude that Mr. Stone's monetary loss was involuntary. As a result of these flaws, an entirely fair and proper jury verdict for a working person has been overturned by this Court. Accordingly, I dissent to these erroneous portions of the majority opinion.

B.

*Errors in the Concurrence*

Despite the erroneous result reached in Parts IV.A and C, the majority opinion is entirely correct on the issue of whether West Virginia courts should blindly adhere to federal case law in the area of disability discrimination law. I therefore disagree with Justice Scott's interpretation of our discrimination jurisprudence, to the extent that the concurrence proposes that our legal analysis in this area should amount to nothing more than Pavlovian responses to federal decisional law.

The majority opinion has fully documented, using scholarly authorities and copious examples, the emergence of a highly diverse and in many instances troubling body of federal law in the area of disability discrimination. Justice Scott's concurrence does not address one single case or example cited in this discussion. Nor does the concurrence confront the majority opinion's detailed analysis of how this Court has often taken a different—and in every instance, superior—approach than that taken by the federal courts.

Obviously, we must presume that the Legislature, by incorporating the language of analogous federal statutes into the West Virginia Human Rights Act, intended that such language should be interpreted consistent with pre-existing federal case law. *Cf., Larzo v. Swift & Co.*, 129 W.Va. 436, 445, 40 S.E.2d 811, 816 (1946); *Allen v. Raleigh–Wyoming Mining Co.*, 117 W.Va. 631, 636, 186 S.E. 612, 614 (1936) ("In construing statutes adopted from another state, the judicial interpretation already placed on that statute by the highest judicial tribunal of such state will usually be adopted."); syl. pt. 2, *Rose v. Public Serv. Comm'n*, 75 W.Va. 1, 83 S.E. 85 (1914) ("When a statute is adopted from another state or country the courts usually follow the construction which it had received by the courts of the state or country from which it was taken."). However, this rule of construction applies only where a significant

body of settled case law interpreting the archetypal statute existed *prior* to the enactment of the subject legislation. As the Court noted in *State v. Friedman,* 124 W.Va. 4, 18 S.E.2d 653 (1942), "it is a sound theory in arriving at the meaning of a statutory provision, the substance of which has for some time been in effect in another state and considered and construed by the courts of that jurisdiction, to carefully examine and regard as persuasive the construction adopted there, *particularly the construction made a part of it before its enactment by the jurisdiction of the pending matter.*" *Id.* at 7, 18 S.E.2d at 655 (emphasis added).

It bears emphasizing that the bulk of the federal case law pertaining to the present question developed following amendment of the Act in 1989. Consequently, these later federal cases have no more persuasive value than what is warranted by the cogency and soundness of their logic.

Let there be no mistaking the fact that the approach advocated by the concurring opinion would have the practical result of drastically limiting the rights of people to bring disability discrimination claims, a result foreshadowed by many recent federal cases. A restrictive approach to protected status in federal disability discrimination law has found support in the ultimate arbiter of federal law, the United States Supreme Court. In *Sutton v. United Airlines,* 527 U.S. 471, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999), the Court held that airline pilots who have myopia, but whose vision is correctable with lenses, did not have protected status to invoke the protections of the ADA and to challenge as unreasonable rules precluding them from certain pilot jobs, despite EEOC guidelines to the contrary. I agree fully with Justice Stevens' dissent in *Sutton:* "If United regards petitioners as unqualified because they cannot see well without glasses, it seems eminently fair for a court also to use uncorrected vision as the basis for evaluating petitioner's life activity of seeing." 527 U.S. at 511, 119 S.Ct. at 2160, 144 L.Ed.2d at 480 (Stevens, J., dissenting).

In *Murphy v. United Parcel Service,* 527 U.S. 516, 119 S.Ct. 2133, 144 L.Ed.2d 484 (1999), the Court held that an employee who was barred from working as a mechanic because of high blood pressure, which was otherwise remedied through medication, did not have protected status to challenge a *per se* employment bar. The *Murphy* Court reasoned that the employee was not protected because he was not impaired when he took his medicine, and because he could work at other types of mechanics' jobs. Murphy's lawyer aptly posed the obvious "Catch–22" question in a subsequent law review article: "How could UPS fire Mr. Murphy for *being too disabled* and claim that he is not protected by the ADA, whose purpose it is to prohibit discrimination on the basis of disability? . . . The 'truly disabled' may be the smallest and most discrete and insular minority in America." Kirk W. Lowry, *A Discrete & Insular Minority: Behind the Headlines of* Murphy v. United Parcel Service, Inc., 39 Washburn L.J. 196, 203, 206 (2000) (emphasis added).

There is no sound basis for denying persons with significant impairments of "normal" functioning standing to assert the protections afforded by the disability discrimination laws, simply because those persons can ameliorate the effects of their disabilities. As one recent observer has forcefully stated:

> *Murphy v. United Parcel Service, Inc.* and *Sutton v. United Airlines, Inc.* will drastically reduce the scope of the ADA's protection. As a result of these decisions, persons who have disabilities that are partially or fully correctable may no longer be protected from discrimination under the ADA. . . . The Supreme Court's decisions contradicted the clear legislative history, the majority of the circuits that have decided the issue, the opinion of the Department of Justice, and most importantly, the EEOC—the agency charged with interpreting the ADA. These decisions ignore the intent of Congress, and have harsh ramifications for individuals with treatable disabilities because they will still be subject to discrimination but will not have the protection of the ADA.

Barbara M. Smith–Duer, Comment, *Too Disabled or Not Disabled Enough: Between A Rock and A Hard Place After* Murphy v.

United Parcel Service, Inc., 39 Washburn L.J. 255, 255–56 (2000) (footnotes omitted).

The Supreme Court has, regrettably, misconstrued Congress's purpose in providing protection for persons "regarded as" being disabled:

> The "regarded as" prong is *supposed* to be a catch-all for individuals who do not qualify as disabled according to the first and second prongs of the definition of disability, but have nevertheless been subject to an adverse disability-based employment action. Courts have wrongly limited coverage to those considered "truly disabled." The entire thrust of the ADA is that individuals should be judged on their abilities, not their medical status. . . .
>
> . . . .
>
> The ADA, like section 504 of the Rehabilitation Act, was never intended to protect only the "truly disabled." If the law were to be so narrowly construed, there would be no need to include the "regarded as" prong in the definition of disability. Instead, Congress's goal was more far reaching. . . .

Arlene B Mayerson, *Restoring Regard For the 'Regarded As' Prong: Giving Effect to Congressional Intent*, 42 Vill. L.Rev. 587, 609–11 (1997). The original drafter of the ADA, Professor Robert Burgdorf,[1] explained the underlying rationale for providing standing to persons perceived as having a disability, when he observed that

> [i]f all individuals have different combinations of strengths and impairments that fall somewhere on the "spectrum of abilities" for the particular function at issue . . . then what do laws such as the ADA mean when they prohibit discrimination against an "individual with a disability?"
>
> . . . .
>
> The recognition that "individuals with disabilities" is a classification created by societal mechanisms that have singled out some people and caused them to be treated differently from others because of real or

perceived mental or physical impairments has profound consequences. It explains the overriding importance of the third prong of the definition of disability. If one is regarded as having a substantial impairment by others, then one has a disability. Satisfaction of this prong focuses solely on whether a person has been singled out for different treatment, not upon whatever physical or mental characteristics the person possesses.

Robert L. Burgdorf, Jr., *"Substantially Limited" Protection From Disability Discrimination: The Special Treatment Model and Misconstructions of the Definition of Disability*, 42 Villa. L.Rev. 409, 527–28 (1997).

Not only has the restrictive approach had the substantive effect of limiting plaintiffs' legitimate claims, but it has also had the procedural effect of denying plaintiffs the opportunity to put their cases before juries. *See* Ruth Colker, *The Americans with Disabilities Act: A Windfall for Defendants*, 34 Harv. C.R.-C.L. L.Rev. 99, 160 (2000) (noting that federal courts applying the ADA "have misused the summary judgment device by reserving issues for the judge that should have gone to the jury and by setting an inappropriately high evidentiary burden for plaintiffs to defeat defendants' motion for summary judgment"). Requiring people who seek protection under of the laws prohibiting disability discrimination to, as a threshold matter, pigeonhole themselves into a "preferred group" has therefore rightly been criticized for having "impaired the interpretation and enforcement of the[ ] [discrimination] laws . . . [and has] generated unnecessary complexity, harsh technicalities and [miserly] standards regarding protection under such statutes." Burgdorf, *supra*, 42 Villa. L.Rev. at 414.

The foregoing should help to amplify the discussion in the majority opinion—and show why it is important that this Court firmly note our independence in the area of disability discrimination law. As the Court recently

---

1. Professor Burgdorf drafted the original Americans with Disabilities Act bill introduced in Congress in 1988, and chaired the Committee on Rights of Persons with Disabilities of the American Bar Association's Section of Individual Rights and Responsibilities.

stated in *Haynes v. Rhone–Poulenc*, 206 W.Va. 18, 521 S.E.2d 331 (1999):

> [T]he Legislature . . . has directed that the provisions of the [Human Rights] Act "shall be liberally construed to accomplish its objectives and purposes." This Court has consistently followed this "liberal construction" imperative in construing provisions of the Human Rights Act . . . .

*Id.* at 32, 521 S.E.2d at 345 (footnote omitted). I therefore concur fully with the reasoning of Part IV.B of the majority opinion.