Affirmed by unpublished opinion. Judge SHEDD wrote the majority opinion, in which Judge WILKINSON joined. ■ Judge WYNN wrote a dissenting opinion.
Unpublished opinions are not binding precedent in this circuit.
SHEDD, Circuit Judge:
While working in a coal mine operated by Consolidation Coal Company (“CCC”), Joyce Anderson fell and suffered multiple bone fractures. Before her fall, Anderson had been diagnosed as having osteoporosis. After her recovery, Anderson attempted to return to her former job. Presented with conflicting medical evidence about Anderson’s post-injury ability to work safely in the mine, CCC implemented a medical-review process dictated by its collective bargaining agreement (“CBA”) with her union. Because two of the three doctors selected under the CBA process opined against Anderson’s return to underground work, CCC prohibited her from returning to her former position. Anderson filed an unsuccessful labor grievance, and when CCC was unable to find a suitable alternative position for her, it terminated her employment. Anderson then filed this lawsuit contending (among other things) that CCC violated West Virginia law by retaliating against her for filing a workers’ compensation claim and by discriminating against her based on the fact that she has osteoporosis. The district court granted CCC’s summary judgment motion on these claims, and Anderson now appeals. For the following reasons, we affirm.
I
Federal Civil Procedure Rule 56(a) provides that the district court “shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.” We review a summary judgment order de novo. Lee Graham Shopping Ctr., LLC v. Estate of Kirsch, 777 F.3d 678, 681 (4th Cir.2015).
West Virginia Code § 23-5A-1 provides that “[n]o employer shall discriminate in any manner against any of his present or former employees because of such present or former employee’s receipt of or attempt to receive” workers’ compensation benefits. West Virginia Code § 5-11-9(1) provides that it is unlawful “[fjor any employer to discriminate against an individual with respect to compensation, hire, tenure, terms, conditions or privileges of employment if the individual is able and competent to perform the services required even if such individual is blind or disabled.”
■ For claims under either statute, the employee bears the ultimate burden of proving the employer’s illegal motive. See CSX Transp., Inc. v. Smith, 229 W.Va. 316, 729 S.E.2d 151, 169 (2012) (retaliation); Hanlon v. Chambers, 195 W.Va. 99, 464 S,E.2d 741, 748 (1995) (discrimination). Where, as here, there is no direct evidence of retaliation or discrimination, the general scheme of proof for both claims is substantially the same: (1) the employee bears the burden of presenting a prima facie case; (2) if she presents a prima facie case, the burden shifts to the employer to present a legitimate, nondiscriminatory reason for her discharge; and (3) if the employer presents such a reason, the employee must establish that the proffered reason is pre-textual. See Powell v. Wyoming Cablevision, Inc., 184 W.Va. 700, 403 S.E.2d 717, 721-22 (1991) (retaliation); Conaway v. Eastern Assoc. Coal Carp., 178 W.Va. 164, *178 358 S.E.2d 423, 429-30 (1986) (discrimination).
II
The following material facts are not disputed. Anderson is a long-time CCC employee who was diagnosed with osteoporosis in 2005. In November 2009, while Anderson was working in the Loveridge Mine, she fell and fractured her elbow and pelvis. Anderson was treated by Dr. Nancy McKinley, an orthopedic surgeon and also underwent physical therapy. Anderson filed a workers’ compensation claim for this injury and received workers’ compensation benefits.
Several months later, Dr. McKinley released Anderson to return to work. Before allowing her to return, CCC (through its workers’ compensation administrator) obtained a medical examination, which included a bone density scan. Dr. Dean Steinman performed this examination and found that the scan results, accompanied by other risk factors and the severity of her injuries from her relatively minor 2009 fall, presented too great a risk of re-fracture to return her to work in the coal mine. When Dr. Steinmaris report was presented' to Dr. McKinley for review, Dr. McKinley noted that although “common sense” may suggest that Anderson not return to work in the mine, J.A. 1262, she did not believe that Anderson was precluded from doing so. Faced with this conflict of opinions, CCC approved a record review by Dr. Vincent Ripepi. Following his review, Dr. Ripepi agreed with Dr. Stein-man.
Anderson disagreed with Dr. Steinman’s and Dr. Ripepi’s medical opinions. CCC therefore implemented Article III(j) of the CBA. In pertinent part, Article III(j) provides that “once employed, an Employee cannot be terminated or refused ... recall from sick or injured status for medical reasons over his objection without the concurrence of a majority of a group composed of an Employer-approved physician, an Employee-approved physician, and a physician agreed to by the Employer and the Employee, that there has been a deterioration in physical condition which prevents the Employee from performing his regular work.” J.A. 861.
Anderson selected Dr. McKinley as the “Employee-approved physician,” and CCC selected Dr. Steinman as the “Employer-approved physician.” By agreement, the parties then met to select the third physician, who would be the tiebreaker. Each party proposed four doctors at this meeting, and each party struck three names proposed by the other, leaving each party with a single physician remaining.[1] The names of the two remaining physicians, Dr. Sushil Sethi — who was CCC’s choice— and Dr. Shelly Kafka — who was Anderson’s choice — were placed in a hat. Anderson selected Dr. Kafka’s name out of the hat, and CCC agreed to use Dr. Kafka. However, Dr. Kafka declined to participate in the evaluation process.
Anderson then put forth two additional doctors’ names. CCC struck one doctor, leaving Dr. Brian Houston as Anderson’s proposed doctor. Dr. Houston’s name was *179 then placed in the hat with Dr. Sethi’s name. Anderson again selected a name from the hat, this time choosing Dr. Sethi. Anderson did not object to being seen by Dr. Sethi, and he performed her physical examination. Thereafter, Dr. Sethi opined that Anderson was not able to work safely underground because of her high risk for repeat fracture. Specifically, Dr. Sethi stated:
On the basis of my examination and review of the medical records as well as my thorough research -of osteoporosis, it is my medical opinion that the deterioration of the bone due to early onset of menopause as well as aging and having caused a fracture with a very minor activity, is a .very high risk factor in performing her regular work. The use of medication including Boniva as well as other listed medications that are available on the market, simply prevent some osteoclastic activity. It does not cure the problem of osteoporosis. After having reviewed the job duties and the risk factors as well as the description of the bunker employee including ability to have the capability of safely evacuating the mine in the event of an emergency, I can say with reasonable degree of medical probability and certainty, that [Anderson] is not able to safely perform her regular work as a bunker attendant at Loveridge Mine. She is a very high risk for repeat fracture which can happen spontaneously or even from a minor tripping and would be a risk to herself as well as other fellow workers.
J.A. 865-66.
Thus, the majority of the medical opinions obtained under the CBA process recommended that Anderson’s high fracture risk made it unsafe for her to return to work in the coal mine. CCC attempted to accommodate Anderson with a surface position as a dispatcher. CCC’s effort, however, was precluded by seniority rules in the CBA. Anderson then filed a grievance seeking reinstatement, but an arbitrator ruled against her, finding that CCC complied with the CBA. CCC encouraged Anderson to apply for an open above-ground position. Although Anderson applied and was interviewed for this position, she ultimately declined to pursue it. Unable to find a satisfactory alternative position for Anderson, CCC terminated her employment.
Ill
Anderson filed this action asserting several state-law claims. Pertinent to this appeal, Anderson alleged that CCC (1) retaliated against her for filing a workers’ compensation claim, in violation of § 23-5A-1 and (2) discriminated against her based on the fact that she has osteoporosis — which CCC perceived to be, or which is in fact, a disability — in violation of § 5-11-9(1). At the close of discovery, CCC moved for summary judgment on several grounds. The district court granted the ■ motion for the following reasons.
Regarding Anderson’s workers’ compensation retaliation claim, the district court noted that Anderson was required to show three elements to establish a prima facie case: (1) she sustained an on-the-job injury; (2) she filed a claim for workers’ compensation benefits; and (3) CCC treated her filing of a workers’ compensation claim as a significant factor in its decision to discharge her. See Powell, 403 S.E.2d at 721. The court found that although Anderson sufficiently showed the first two elements, she failed to show the third element. The court explained that CCC “acted under the CBA which governed the procedure” regarding her potential return to work and “a majority of the necessary medical opinions found that [Anderson] should not return to work.” J.A. 1039. *180 The court stated: “Simply put, no evidence exists to demonstrate or imply that [CCC] terminated [Anderson] with [workers’] compensation costs serving as a ‘significant’ factor.” J.A. 1039-40.
Regarding Anderson’s disability discrimination claim, the district court noted that Anderson was required to show three elements to establish a prima facie case: (1) she is a member of a protected class; (2) CCC took an adverse action against her; and (3) but for her protected status, CCC would not have taken the adverse action. See Conaway, 358 S.E.2d at 429. Again, the court found that Anderson sufficiently showed the first two elements, but she failed to show the third element. The court explained that although CCC was aware of Anderson’s osteoporosis, it did not base the decision to terminate her on the grounds that she is disabled. The court stated:
Rather, in compliance with the CBA, [CCC and Anderson] received three medical opinions regarding [her] ability to return to work. Of those three opinions, two of the opinions advised the parties that [Anderson] should not return to work. Relying on these medical opinions, and not simply [her] status as “disabled” ... [CCC] terminated her employment.
J.A. 1044.
The district court addressed and rejected Anderson’s argument that the doctors chosen by CCC for the CBA process were “company doctors” rather than osteoporosis specialists. The court found that “insufficient evidence has been offered to support these claims, and they are speculation at best.” J.A. 1044. Further, the court stated that “the specialty-level of the doctors in this case is not a germane issue to the law at issue.” J.A. 1044-45. Reiterating its earlier discussion of the workers’ compensation retaliation claim, the court explained:
The facts show that [CCC] acted under an honest belief regarding whether to discharge [Anderson], basing the decision on the recommendations by licensed physicians with experience, though technically not specialties, in osteoporosis. Both parties together selected the third physician, meaning that [Anderson] herself agreed to be examined by this physician. More importantly, the terms of the CBA do not require the evaluating doctors be specialists in their field. Thus, the argument that the evaluating doctors did not practice in any medical specialty or possess any particular certification relating to osteoporosis is not relevant in this civil action, as such was not required under the CBA.
J.A. 1045.
The district court further concluded that even if Anderson had shown a prima facie case of disability discrimination, CCC offered a legitimate nondiseriminatory reason for her discharge: the CBA medical review process, which led to the medical opinions advising that she not return to her former position. Finally, the court found that Anderson failed to present sufficient evidence of pretext to rebut CCC’s proffered reason.
IV
Anderson contends that the district court erred in several respects by granting CCC’s summary judgment motion. Anderson primarily argues that the court erred in assessing her disability discrimination claim because it failed to conduct the analysis set forth in West Virginia Code of State Rules § 77-1-4.8. She also argues with respect to both of her claims that the court resolved disputed facts against her and failed to recognize the existence of genuine issues of material *181 fact. In response, CCC argues that the court correctly entered summary judgment on Anderson’s claims.
Having carefully considered this matter under the appropriate summary judgment standard, we agree with the district court that the undisputed material facts in the record establish as a matter of law that CCC’s decision to terminate Anderson’s employment was not based on a discriminatory or retaliatory motive. Instead, those facts establish that when Anderson attempted to return to work following her work-related injury, CCC was presented with conflicting medical opinions about whether she could do so safely.[2] For that reason, CCC implemented the CBA medical-review process, in which Anderson fully and freely participated, and two of the three doctors selected in that process opined against her return to the coal mine.[3] Consequently, CCC was then within its collectively bargained right to prohibit Anderson from returning to the coal mine. Ultimately, CCC' terminated Anderson’s employment only after it was unable to place her in a suitable alternative position.
Anderson has proffered evidence which she contends creates genuine issues of material fact about the qualifications and opinions of the doctors who examined her as part of the CBA medical-review process and about the purported motives of CCC personnel. We have considered this evidence in our summary judgment review. However, we conclude that Anderson has failed to present sufficient evidence to create a genuine issue of material fact to establish that her filing of a workers’ compensation claim was a significant factor in CCC’s decision to terminate her. For this reason, we affirm the grant of summary judgment on the retaliation claim. See, e.g., Yoho v. Triangle PWC, Inc., 175 W.Va. 556, 336 S.E.2d 204, 210 (1985) (affirming dismissal of § 23-5A-1 claim where the employee was discharged pursuant to a “facially neutral provision of the collective bargaining agreement”). Likewise, we conclude .that even if Anderson presented sufficient evidence to establish a prima facie case of discrimination, CCC has presented a legitimate, nondiscriminatory reason for terminating her employment (ie., the CBA medical-review process), and she has failed to present sufficient evidence to establish pretext. Therefore, we affirm the grant of summary judgment on the discrimination claim. See, e.g., Bailey v. Norfolk and W. Ry. Co., 206 W.Va. 654, 527 S.E.2d 516, 536 (1999) (noting that the parties’ collective bargaining agreement provided a legitimate, non-discriminatory reason for the challenged action).
As noted, Anderson primarily argues that the district court failed to analyze her discrimination claim under West Virginia Code of State Rules § 77-1-4.8. We disagree with Anderson’s contention that § 77-1-4.8 dictates a different outcome.
Rule 77-1-4 is titled “Employment Discrimination Prohibited” and is part of “a *182 detailed explication of the general anti-discrimination requirements of the Human Rights Act, [§ 5-11-9].” Stone, 538 S.E.2d at 396 n. 8. Section 77-1-4.1 and its subsections prohibit disability discrimination in employment. Various other sections of Rule 77-1-4 deal with matters that are unrelated to this case, but two sections, §§ 77-1-4.7 and 4.8, are pertinent to our discussion.
Section 77-1-4.7 provides that an “individual’s ability to perform a particular job must be assessed on an individual basis,” and an employer “may discharge a qualified individual with a disability if, even after reasonable accommodation, the individual is unable to perform the essential functions of the job without creating a substantial hazard to his/her health and safety or the health and safety of others.” Section 77-1-4.7 cautions that “any such decision shall be [based] upon the individual’s actual abilities, and not upon general assumptions or stereotypes about persons with particular mental or physical disabilities.”
Section 77-1-4.8 then provides that “[i]n deciding whether an individual poses a direct threat to health and safety, the employer has the burden of demonstrating that a reasonable probability of a materially enhanced risk of substantial harm to the health or safety of the individual or others cannot be eliminated or reduced by reasonable accommodation.” Further, § 77-1-4.8 specifies that “[t]he employer’s determination that an individual poses a ‘direct threat’ shall be based on an individualized assessment of the individual’s present ability to safely perform the essential functions of the job. This assessment shall be based on a reasonable medical judgement [sic] that relies on the most current medical knowledge and/or on the best available objective evidence.” Section 77-1-4.8 concludes by listing several non-exclusive factors to be considered in determining whether an individual would pose a direct threat.
According to Anderson, § 77-1-4.8 “is an affirmative defense that requires the employer to prove that the medical opinion upon which it relies was based on an ‘individualized assessment’ of the employee, on ‘competent medical advice’ and on the ‘most current medical knowledge’ in the relevant field.” Opening Brief of Appellant, at 8.[4] Anderson argues that CCC failed to comply with § 77-1-4.8 because it selected and recommended evaluators who “it knew or should have known had little or no expertise in osteoporosis, who lacked ‘current medical knowledge’ about the disease and who did not provide competent opinions about [her] risk of future injury.” Id. at 9.
Although the role of § 77-1-4.8 within the shifting-burden analysis used for employment discrimination claims is not entirely clear, we will assume that the section becomes applicable when, in response to an employee’s prima facie case, the employer asserts that an employee cannot safely perform her job as a legitimate, non-discriminatory reason for termination. As we have already held, the undisputed evidence establishes that CCC terminated Anderson as a result of the CBA medical-review process, which is unquestionably a legitimate, nondiscriminatory reason. Contrary to Anderson’s argument, we conclude that through its implementation of *183 the CBA medical-review process, CCC met its burden under § 77-1-4.8.[5]
Fundamentally, § 77-1-4.8 requires that the employer’s decision must be made on “an individualized assessment of the individual’s present ability to safely perform the essential functions of the job.” By relying on the various specific medical opinions obtained before and during the CBA medical-review process, CCC made its decision about Anderson’s ability to return to the coal mine on an individualized assessment of her condition and ability rather than “upon general assumptions or stereotypes about persons” with osteoporosis. § 77-1-4.7.
Moving forward in the analysis, § 77 — 1— 4.8 specifies that the individualized assessment must be based on a “reasonable” medical judgment (from a competent medical practitioner) who relies on “the most current medical knowledge” or on “the best available objective evidence.”[6] We believe the undisputed material evidence in the record establishes that CCC met this standard. CCC utilized doctors who had the ability to conduct the medical testing specific to Anderson’s condition and who were experienced in providing occupational medical evaluations. These doctors assessed Anderson’s bone density scans, along with other risk factors, and examined extensive details regarding the specific job requirements of her position. To be sure, Anderson points to conflicting evidence regarding her ability to return to her former position, but the fact that medical opinions differ does not establish that CCC’s reliance on Dr. Steinman’s and Dr. Sethi’s assessments was unreasonable.[7] Moreover, although Anderson contends that CCC was required to utilize and rely only on osteoporosis specialists in making its individualized assessment, we find nothing to establish that § 77-1-4.8 imposes such a rigid requirement. See generally Farley v. Shook, 218 W.Va. 680, 629 S.E.2d 739, 746 (2006) (“While a physician does not have to be board certified in a specialty to qualify to render an expert opinion, the physician must have some experience or knowledge on which to base his or her opinion.”).
V
We are not unsympathetic to Anderson’s desire to return to her job. However, *184 West Virginia law recognizes “the right of an employer to protect employees, the public, and the workplace from danger or injury that might occur as a result of a person’s possible impairments, when such protection is done in a fashion that is consistent with the duty of reasonable accommodation.” Stone, 538 S.E.2d at 397. This right is also embodied in the CBA. Based on the record before us, we agree with the district court that the undisputed material evidence establishes that CCC did not illegally retaliate or discriminate against her. Therefore, we affirm the judgment.

AFFIRMED.

. Helen Blevins, a registered nurse, testified on behalf of CCC that a limited number of area doctors were willing to engage in workers’ compensation and similar evaluative work. When she selected doctors for the CBA process, she looked at factors such as a doctor’s capability, knowledge, availability, willingness, and timeliness in an effort to obtain the best and most timely results. Anderson argues that proof of CCC’s improper motives lies in the fact that CCC proffered only doctors who were not osteoporosis specialists. However, CCC did proffer an orthopedic surgeon, but Anderson struck this doctor from the list.

. CCC's decision to have Anderson evaluated before returning her to work did not violate West Virginia law. See, e.g., Stone v. St, Joseph’s Hosp. of Parkersburg, 208 W.Va. 91, 538 S.E.2d 389, 407 (2000) ("[T]he mere fact that the Hospital sent Mr, Stone for an independent medical examination did not prove a case of disability discrimination.”),

. Dr. Ripepi also opined against Anderson's return to work in the mine. Therefore, three doctors who considered the matter before Anderson was terminated believed that she should not return to the mine. Moreover, Dr. McKinley (who was Anderson’s choice in the Article III(j) process) equivocated, stating that "common sense” suggested that Anderson not return to the mine.

. In Stone, the court explained that “to satisfy the standard of a serious threat to one’s health or safety, the employer must establish that it relied upon competent medical advice that there exists a reasonably probable risk of serious harm.” 538 S.E.2d at 397 (emphasis added and citation omitted).

. CCC unsuccessfully argued below that Anderson’s claims are preempted by the Federal Labor Management Relations Act ("LMRA"). CCC reiterates this argument as one of several alternate bases for affirming the summary judgment. We need not decide the issue, but we note that Anderson’s reliance on § 771-4.8 does raise a significant LMRA preemption question. See Barton v. House of Raeford Farms, Inc,, 745 F.3d 95, 107 (4th Cir.), cert. denied, — U.S. -, 135 S.Ct. 160, 190 L.Ed.2d 49 (2014) (stating the general rule that when the evaluation of the state law claim is inextricably intertwined with consideration of the terms of the labor contract, such that it is necessary to interpret the collective-bargaining agreement to resolve the claim, the claim is preempted).

. Section 77-1-4.8 states that the assessment "shall be based on a reasonable medical judgement [sic] that relies on the most current medical knowledge and/or on the best available objective evidence." The term "and/or” typically means “or.” See Curry v. W.Va. Consol. Pub. Retire. Bd., 236 W.Va. 188, 778 S.E.2d 637, 642 n. 4 (2015); Dynalectron Corp. v. Equitable Trust Co., 704 F.2d 737, 739 (4th Cir.1983).

.As noted, Anderson recommended both Dr. McKinley and Dr. Kafka during the CBA medical-review process, but Dr. Kafka declined to participate. Dr. Kafka did examine Anderson at a later time, and Anderson now relies on Dr. Kafka’s opinion to support her case. Had Dr. Kafka rendered her opinion during the CBA process, she would have cast the tie-breaking vote in Anderson’s favor, and CCC presumably would have been obligated under the CBA to return Anderson to work. These facts highlight the role of the CBA process in Anderson’s termination and undercut her claims of retaliation and discrimination.