WYNN, Circuit Judge,
dissenting:
Joyce Anderson was fifty-two years old and had a satisfactory work record nearly three decades long when Consolidation Coal Company (“CCC”) terminated her, on the grounds that her osteoporosis prevented her return to work after recovering from a fracture. Ostensibly, CCC based her termination on company-directed medical evaluations rendered after Anderson’s treating orthopedic surgeon had already unreservedly cleared her to return to work, and those evaluations appear to have been based largely on an erroneous interpretation of a single study found through Google or similar search engines.
The majority opinion nevertheless concludes that there is no genuine factual dispute regarding whether CCC’s termination decision satisfied the relevant state standards-that is, whether it was based on a “reasonable” medical judgment, one “that relie[d] on the most current medical knowledge and/or on the best available objective evidence.” Ante, at 183; W. Va. Code R. § 77-1-4.8. I cannot reach the same conclusion. For this reason and those elaborated below, I dissent.
I.
A.
The majority opinion assumes, without deciding, that Anderson has successfully made out a prima facie case of disability discrimination. Ante, at 181-82, In my view, the[1] issue is simple enough to decide. Andersoh provided abundant evidence that she was ¡“regarded as” disabled by CCC, W. Va.q'ode § 5-11-3(m)(3); Stone v. St. Joseph’s Hosp. of Parkersburg, 208 W.Va. 91, 538 S.E,2d 389, 399 (2000), and that “but for” that perception of her disability, she would not have been terminated. See Conaway v. E. Associated Coal Corp., 178 W.Va. 164, 358 S.E.2d 423, 429 (1986) (enumerating the elements of a prima facie discrimination claim under West Virginia Code § 5-11-9). The district court therefore erred in concluding that Anderson failed to make out a prima facie case of disability discrimination.[1]
B.
The majority opinion concludes that Anderson failed to make out a prima facie case of workers’ compensation retaliation, ante, at 181, which requires an employee to offer sufficient evidence that: “(1) an on-the-job injury was sustained; (2) pro *185 ceedings were instituted under the Workers’ Compensation Act ...; and (3) the filing of a workers’ compensation claim was a significant factor in the employer’s decision to discharge or otherwise discriminate against the employee.” Powell v. Wyo. Cablevision, Inc., 184 W.Va. 700, 403 S.E.2d 717, 721 (1991), The majority opinion states that Anderson “has failed to present sufficient evidence to create a genuine issue of material fact” regarding the third, “nexus” element, i.e., whether “her filing of a workers’ compensation clam was a significant factor in CCC’s decision to terminate her.” Ante, at 181. I disagree.
Due to the typical lack of direct evidence in employment retaliation cases, we are to examine circumstantial evidence when evaluating the third element of a plaintiffs prima facie case, including “[pjroximity in time of the claim and the firing,” “[ejvi-dence of satisfactory work performance and supervisory evaluations before the accident,” and “[a]ny evidence of an actual pattern of harassing conduct for submitting the claim.” Powell, 403 S.E.2d at 721.
Here, Anderson offered evidence with respect to each of these factors. First, with respect to the “proximity in time” factor, Anderson began receiving workers’ compensation benefits on November 4, 2009, was released to return to work by her physician on March 24, 2010, effective March 29, without restrictions, was informed on April 25 that she would not be allowed to return to work, and was terminated on June 22. The proximity among these various dates contributes to a permissible inference that the workers’ compensation claim was a “significant factor” in Anderson’s termination. Id.
Second, the record contains “[e]vidence of satisfactory work performance and supervisory evaluations before the accident.” Id. Anderson was employed continuously with CCC from October 15, 1981, through the date of her termination; in that time, she established a “good work record” and was “well thought of by both Management and her fellow employees.” J.A. 858.
Third, although there was no “pattern of harassment” following the submission of Anderson’s workers’ compensation claim, Powell, 403 S.E.2d at 721, there is evidence that before learning of the initial return-to-work examination, Anderson received a call from an employee of Wells Fargo, CCC’s workers’ compensation administrator, advising Anderson that CCC was “going to make an issue of the osteoporosis” and “was going to put the screws to” her. J.A. 136-37.
Finally, in addition to the above factors, a trier of fact is permitted to consider any circumstantial evidence relevant to the “nexus” prong. Such evidence includes the fact that CCC is self-insured, and that CCC regularly sends to its human resources managers workers’ compensation claim reports that include information about the cost of benefits paid to each injured miner. Such evidence suggests that CCC may have been unusually concerned about the costs of its workers’ compensation program. See Nestor v. Bruce Hardwood Floors, L.P., 210 W.Va. 692, 558 S.E.2d 691, 695-96 (2001) (finding a triable question of fact where “[the employer’s] supervisor bonus system could encourage a supervisor to discriminate against an employee who files for workers’ compensation benefits, even if ... the bonus system helps reduce workplace injuries”).
In sum, Anderson presented sufficient evidence to establish all three elements of a prima facie workers’ compensation retaliation case, including evidence that her workers’ compensation filing was a significant factor in CCC’s decision to fire her.
*186 II.
Both parties appear to concede, and the majority assumes, that the requirements of section 77-1-4.8 apply “when, in response to an employee’s prima facie case, the employer asserts that an employee cannot safely perform her job as a legitimate, non-discriminatory reason for termination.” Ante, at 182. I agree. See Ranger Fuel Corp. v. W. Va. Human Rights Comm’n, 180 W.Va. 260, 376 S.E.2d 154, 160 (1988) (“The fact that an applicant’s handicap creates a reasonable probability of a materially enhanced risk of substantial harm to the handicapped person or others is a legitimate, nondiscriminatory reason [for an adverse employment action].”); Syl. Pt. 3, Davidson v. Shoney’s Big Boy Rest., 181 W.Va. 65, 380 S.E.2d 232, 233 (1989) (“[T]o satisfy the standard of a serious threat to one’s health or safety, the employer must establish that it relied upon competent medical advice that there exists a reasonably probable risk of serious harm.”). In short, it is quite clear that CCC was required to meet the standards of section 77-1-4.8 for its termination decision to be “legitimate” and “non-discriminatory.”
Those standards are detailed and rigorous. See ante, at 182. And at summary judgment this Court is tasked with determining, inter alia, if there is any “genuine dispute,” Fed.R.Civ.P. 56(a), as to whether CCC’s termination decision was “based on a reasonable medical judgement,” one founded “on the most current medical knowledge and/or on the best available objective evidence.” W. Va.Code R. §. 77-1-4.8.
Significant to my disagreement with the majority view, the dispositive question is not, as the majority’s discussion suggests, whether CCC “utilized doctors who had the ability to conduct the medical testing specific to Anderson’s condition and who were experienced in providing occupational medical evaluations.” Ante, at 183. Rather, by its plain terms, section 77-1-4.8 requires that the assessment be “reasonable” and based on “the most current medical knowledge” or the “best available objective evidence.”[2]
Nor is the dispositive question, as the majority’s discussion elsewhere suggests, whether CCC complied with the terms of its collective bargaining agreement. See ante, at 181, 182-83. That is not what section 77-1-4.8 says. Indeed, on more than one occasion, West Virginia’s highest court has recognized that a facially neutral company policy can be exploited to achieve a discriminatory objective. Skaggs v. E. Associated Coal Corp., 212 W.Va. 248, 569 S.E.2d 769, 777 (2002) (noting that “the employer’s use of a system of preferred providers for rehabilitation services ... could be interpreted as a pretext for a scheme to terminate employees who had received workers’ compensation benefits”); Wriston v. Raleigh Cty. Emergency Servs. Auth., 205 W.Va. 409, 518 S.E.2d 650, 659 (1999) (“[W]hile an employment policy may be facially neutral, it cannot be applied in a manner that nullifies or trumps the protective requirements of [a statutory prohibition on discriminatory practices].”).
Section 77-1-4.8 did not require that CCC get the approval of a specialist or that it comply with the terms of its own policies. It did require that CCC’s termination decision be “based on a reasonable medical judgement,” one founded “on the most current medical knowledge and/or on *187 the best available objective evidence.” W. Va.Code R. § 77-1-4.8. Here, there is clearly at least a genuine dispute as to whether those standards were met.
In countering the initial medical evaluation by Anderson’s treating orthopedic surgeon, who cleared Anderson for work,[3] CCC relied upon the evaluations of three doctors, none of whom had any special expertise in osteoporosis, and all of whom relied heavily on a single study that they appear by their own admission either to have misunderstood or to have never read in the first place. To illustrate why there is at the very least a genuine dispute as to whether these evaluations were based on “the most current medical knowledge” or the “best available objective evidence,” W.' Va.Code R. § 77-1-4.8, I briefly discuss each.
Dr. Steinman was the first CCC doctor to examine Anderson. His conclusion that Anderson’s osteoporosis prevented her return to work was discussed in a single paragraph, and his discussion of Anderson’s fracture risk relied upon a single study peddling a particular fracture risk score (“FRISK”) for osteoporosis patients (the “FRISK study”). Dr. Stein-man’s deposition testimony suggests that a Google search led him to this study.[4]
In applying the FRISK study to Anderson, Dr. Steinman self-admittedly committed several errors. First, although Dr. Steinman intended to cite the study that developed the FRISK score, he instead cited a letter to the editor critiquing that study on the grounds that it over-predicted fracture risk. Second, while Dr. Steinman previously interpreted the FRISK study to mean that Anderson had at least a fifty-percent probability of a fracture within two years, he now concedes gross error: It turns out that figure was only ten percent.
Finally, it appears that the FRISK study’s findings were at best marginally relevant to Anderson. The study was based on a cohort of subjects significantly *188 older and less physically active than Anderson, facts Dr. Steinman was unaware of at the time, and the fracture risk score the study developed was intended for use in the context of making treatment decisions, not fítness-for-work evaluations.
CCC also relied upon Dr. Ripepi’s “chart review” of Dr. Steinman’s report, which was limited to examining that report and the four corners of Anderson’s medical records. Dr. Ripepi noted that he agreed completely with Dr. Steinman’s conclusions, and specifically that Anderson would be at a high risk of repeat fracture, a conclusion Dr. Steinman had based primarily on his self-admittedly flawed understanding of the FRISK study. However, in his deposition, Dr. Ripepi admitted that he never read that study.[5] Rather, he assumed Dr. Steinman was “familiar with that literature”: in Dr. Ripepi’s words, it “is a pretty good assumption, that if you’re going to quote something, then you’re pretty darn sure of it.” J.A. 780. Here, that was not a good assumption to make.
Finally, CCC relied upon Dr. Sethi’s evaluation of Anderson, which in turn relied upon the previous evaluations by Drs. Steinman and Ripepi. In his deposition, Dr. Sethi also admitted that he never read the FRISK study.[6] Indeed, he too erroneously cited the letter to the editor critiquing the study he meant to cite. Although Dr. Sethi reviewed Dr. McKinley’s evaluation of Anderson, clearing her for work, he discredited that evaluation on the grounds — now somewhat ironic — that Dr. McKinley did not base her conclusion on specific medical studies. Much of Dr. Se-thi’s analysis had nothing to do with Anderson specifically. The l’est was based on the errant assessments of fracture risk made by Drs. Steinman and Ripepi, or what Dr. Sethi later admitted to relying on: “common sense.” J.A. 823. Although Dr. Sethi attached to his evaluation a copy of one medical article on osteoporosis and a partial copy of another, these studies are nowhere referenced or discussed in his evaluation.
In sum, CCC’s doctors relied on an inapplicable study and on each others’ faulty evaluations to conclude that Anderson’s osteoporosis precluded her from returning to work. I simply cannot join the majority opinion in concluding that there exists no genuine dispute as to whether those troubled evaluations were “reasonable” and *189 based on “the most current medical knowledge” or the “best available objective evidence.” W. Va.Code R. § 77-1-4.8.
III.
In conclusion, in my view, Anderson has made out a prima facie case of disability discrimination and workers’ compensation retaliation. Additionally, material issues of fact remain regarding whether CCC has met West Virginia’s mandatory standards for what constitutes a legitimate, non-discriminatory basis for termination under these circumstances. Where an evaluating doctor has himself conceded that his methodology was erroneous, I cannot conclude that it is beyond dispute that such a judgment was “reasonable” and based on “the most current medical knowledge” or “the best objective evidence.” Therefore, summary judgment should have been denied. Accordingly, I respectfully dissent.

. The district court arguably should have applied a different prima facie test, specific to disability discrimination suits in West Virginia, which requires that the plaintiff (1) satisfy the definition of “handicapped” or “disabled,” (2) be able to perform, with reasonable accommodation, the relevant job, and (3) was discharged. Hosaflook v. Consolidation Coal Co., 201 W.Va. 325, 497 S.E.2d 174, 179-80 (1997), Anderson provided sufficient evidence to satisfy these elements, too. Cf. Morris Mem'l Convalescent Nursing Home, Inc. v. W. Va. Human Rights Comm’n, 189 W.Va. 314, 431 S.E.2d 353, 357-59 (1993).

. The majority opinion posits that "and/or” should be read simply as a disjunctive “or.” Ante, at 183 n.6. I will not quibble with the majority’s interpretation, because in this case, there is a genuine dispute as to whether the judgment in question was based on either the most current medical knowledge or the best available objective evidence.

. Anderson has presented the evaluations of two doctors with specialized expertise in osteoporosis concurring with Dr. McKinley’s initial clearance of Anderson for work. One of these doctors — Dr. Bellantoni — has "23 years of experience as a faculty physician at Johns Hopkins University School of Medicine with an expertise in the evaluation and treatment of metabolic bone disorders including osteoporosis.” J.A. 703. This expert evidence is not necessary to or sufficient for my analysis, and I do not intend to convert eveiy "direct threat” case into a battle of the experts. Nevertheless, Anderson's expert evidence is at least relevant in determining whether there is a genuine dispute regarding whether the medical judgment CCC relied upon in terminating Anderson complied with the standards outlined in section 77-1-4.8, including whether that judgment was "reasonable.” See Echazabal v. Chevron USA, Inc., 336 F.3d 1023, 1033 (9th Cir.2003) (explaining the relevance of a plaintiff’s expert evidence in an analogous federal suit, brought under the Americans with Disabilities Act of 1990).

. "Q. Well, you could have gone on — back in 2010, you could have gone on medical journal databases and done some additional research, couldn't you?
A. What I did, I thought, was the — everything that I could do.
Q. Sir, couldn’t you have gone on PubMed— PubMed, P-U-B, capital P, M-E-D, capital M?
A. It’s my understanding that what I normally do in looking for things is actually bigger than PubMed—
Q. Where did you normally go — you go?
A. —because I — I get things that are above and beyond PubMed.
Q. Where did you go? Where did you do the research where you came up with this article as the state of the art?
A. Just do database—
Q. What database? Google? You just Google?
A. Google, Bing, anything that’s available.” J.A. 578.

. "Q. Did you review the article — literature [Dr. Steinman] relied on at the time you rendered your opinion that you agreed with him?
A. No. I agreed with his report.
Q. Did you review the literature that he relied on? ...
A. No.
Q. Have you ever reviewed the literature he relied on?
.A. No.”J.A. 772.

. “Q. Doctor, when you said the fracture risk was developed by Dr. J. Gorricho, published by the Journal of Radiologists on October 1, 2007, before you put that in your report, did you check out and see if that was true?
A. Doctor — I am simply — I am reporting in the context of a review of the medical records. I'm not treating physician. I’m not criticizing. I do not need to look up that. I am simply going by what is in the record and simply quoting another person’s — what they said. And the review of the record is only a review of the records. It is—
Q. Did you check — I’m sorry.
A. I don’t know — -I do not need to check anything.
Q. But my question is did you check and see if what Dr. Steinman said about the Gorricho fracture risk was true? Did you check and see if it was true?
A. I do not need to check it because my role is only reviewing the record and quoting what is in the record.
Q. So the answer then is, no, you did not check it?
A. I do not need to check it.
Q. And so you did not check it?
A. I did not.” J.A. 810-11.